**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUN 25 2003**

**PATRICK FISHER**
**Clerk**

PUBLISH

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

DAVID WAYNE HATFIELD,

      Defendant - Appellant.

No. 01-7151

---

**Appeal from the United States District Court**
**for the Eastern District of Oklahoma**
**(D.C. No. CR-00-82-01-S)**

---

Donn F. Baker of Baker & Baker, Tahlequah, Oklahoma, for Defendant-Appellant.

D. Michael Littlefield, Assistant United States Attorney (Sheldon J. Sperling, United States Attorney, with him on the brief), Muskogee, Oklahoma, for Plaintiff-Appellee.

---

Before **EBEL**, **BALDOCK**, and **KELLY**, Circuit Judges.

---

**EBEL**, Circuit Judge.

---

      David Wayne Hatfield pled guilty to possession with intent to distribute

marijuana in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(D), and 18 U.S.C. § 2,

and of maintaining a place for the purpose of manufacturing, distributing, and using methamphetamine and marijuana in violation of 21 U.S.C. §§ 856(a)(1) and 856(a)(2), and 18 U.S.C. § 2. He was sentenced by the United States District Court for the Eastern District of Oklahoma to imprisonment for thirty-six months. Before Hatfield entered his guilty plea, the district court had denied Hatfield's motion to suppress evidence seized at his home pursuant to a warrant. As part of his plea agreement with the United States, Hatfield reserved the right to appeal that decision. In this appeal, Hatfield challenges the denial of the suppression motion, arguing that the evidence seized pursuant to the warrant was "fruit of the poisonous tree." He claims that there were two poisonous trees in this case: two unconstitutional searches conducted prior to the issuance of the warrant that produced facts used by the police to obtain the warrant. Our jurisdiction arises under 28 U.S.C. § 1291, and we find that the police activity Hatfield complains of did not amount to searches triggering the protections of the Fourth Amendment. Accordingly, we AFFIRM the district court's denial of Hatfield's motion to suppress.

## I

In the afternoon of October 10, 2000, the Sheriff's Department of Adair County, Oklahoma, received an anonymous tip that Hatfield was growing

marijuana behind his house. Undersheriff Gary Sinclaire dispatched Lieutenant Tim McCullum and Deputy Linda Sinclaire to Hatfield's home to conduct a "knock and talk" interview. The purpose of the interview was to inform Hatfield of the tip and ask his permission to search his property for marijuana.

Officers McCullum and Sinclaire arrived at Hatfield's house at about 4:00 P.M. and parked their police car behind Hatfield's pickup on the east side of the house on a concrete parking pad. When they got out of their car, Officer Sinclaire went to the front door on the north side of the house to make contact with Hatfield, and McCullum walked up the parking pad approximately twenty feet until he was alongside the passenger door of the pickup truck. McCullum did not leave the parking pad or enter the back yard, which lies to the south of the house. He took his position for protective purposes, in case someone exited the house from the rear and moved toward the front of the house via the parking pad. From his position on the parking pad, Officer McCullum could see into the back yard. As soon as McCullum heard that Hatfield had answered the door and was speaking to Officer Sinclaire, McCullum left his position alongside the pickup truck and returned to the passenger side of the patrol car where he could observe Hatfield and Sinclaire.

Officer McCullum heard Sinclaire tell Hatfield about the phone call informing them that marijuana was growing on Hatfield's property and ask him if

he would give them permission to search the property. Hatfield refused to consent to a search and told the Officers that they could not search his property without a warrant. McCullum and Sinclaire told Hatfield they would get a warrant, returned to their patrol car, and backed out onto the county road. Once they were parked on the road, they notified their superior by radio what had transpired and he told them to wait there until he arrived.

Overhearing the conversation on the radio, Deputy Dale Harrold proceeded to Hatfield's home and arrived at the scene next. Harrold conferred with Officers McCullum and Sinclaire on the county road. They told him that they had received a tip that marijuana was growing behind Hatfield's house, that they had sought Hatfield's consent to a search of the property, but that Hatfield had refused to give his consent to the search. Officer Harrold also testified at the suppression hearing that Officer McCullum had told him he had seen small structures in the backyard in which marijuana might be growing.

Officer Harrold had several years of experience and training as a marijuana spotter with the Oklahoma Bureau of Narcotics, and after he was apprized of the situation at Hatfield's residence he walked west down the county road for approximately fifty or sixty feet alongside a fenced pasture to a point from which he could look behind Hatfield's house. From his vantage point on the county road, Harrold could see a tin shed and what appeared to be a chicken coop in the

back yard, and he reported to be able to see what appeared to be marijuana growing behind the tin shed and inside the chicken coop. Wanting to confirm what he had seen from the road before arresting Hatfield, Officer Harrold walked back east along the county road to the fence separating Hatfield's yard from the pasture, crossed into the pasture, and walked south along the fence toward the back of Hatfield's house. When he reached a point along the fence across from the structures behind Hatfield's house, he confirmed that marijuana was growing there.

While Officer Harrold was walking along the pasture-side of the fence toward the back of the house, Hatfield, too, was walking toward the back of the house, but in his yard, on the other side of the fence. Hatfield was yelling expletives at Harrold and repeatedly told him that he was trespassing and to get off of his property. Once Harrold had sighted the marijuana from inside the pasture, however, he instructed Hatfield to walk back to where the other officers were standing on the county road and Hatfield complied. When he reached the officers, Harrold instructed them to place Hatfield under arrest for cultivation of marijuana. The officers then conducted a protective sweep through the house to be sure no one else was present. The sweep lasted no more than thirty to forty-five seconds and disclosed no one else on the premises.

After the officers secured the premises, Officer Harrold left to obtain a search warrant. Harrold swore out an affidavit in support of the issuance of a warrant in which he stated that the Sheriff's Office had received an anonymous tip that marijuana was growing at Hatfield's residence and that he had personally seen "approximately 12 marijuana plants in plain view in the yard" at Hatfield's residence. A warrant was issued to search the house and the structures behind the house, and Harrold returned to Hatfield's property to execute the warrant. During the ensuing search, the officers seized marijuana plants growing in the chicken coop and in other locations in the back yard. They also seized marijuana plants hung for drying in another of the structures behind the house and an ice chest containing sixty-nine marijuana starter plants.

After the Government filed an initial indictment, Hatfield was charged in a fifteen-count superseding indictment on January 18, 2001, that alleged various drug and firearm crimes. Hatfield moved to suppress the evidence gathered at the search of his home and property, arguing that the search violated his Fourth Amendment rights because (1) the search of his property was based upon an uncorroborated, anonymous tip; (2) the marijuana was growing in the curtilage of Hatfield's home and Officer Harrold illegally trespassed on Hatfield's property to see it; and (3) the protective sweep of Hatfield's house had constituted an additional warrantless search.

The district court held a suppression hearing at which several of the officers who participated in the events testified. After considering the record created by the hearing, the district court issued an order denying Hatfield's suppression motion. The district court concluded first that the anonymous tip formed only the basis for the officer's "knock and talk" interview, not the basis for obtaining a search warrant. Once Hatfield had refused consent to a search, the officers retreated to the county road in front of his house. The nature of the tip, the court concluded, therefore was irrelevant to the validity of the subsequent searches. Next, the court ruled that under the "open fields" doctrine Officer Harrold properly could have entered the pasture adjoining Hatfield's property, and his sighting of the marijuana from the pasture was not an unreasonable search in violation of the Fourth Amendment. Finally, the district court concluded that, not only was the protective sweep proper, but that Hatfield's objection to it was merely "academic" because the officers found no evidence during that sweep.

After his motion was denied, Hatfield entered into a plea agreement with the Government under which he pled guilty to one count of possession with intent to distribute marijuana in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(D), and 18 U.S.C. § 2, and to one count of maintaining a place for the purpose of manufacturing, distributing, and using methamphetamine and marijuana in violation of 21 U.S.C. §§ 856(a)(1) and 856(a)(2), and 18 U.S.C. § 2. In

exchange for this guilty plea, the Government agreed to drop the other counts in the indictment. The agreement also specifically reserved, pursuant to Fed. R. Crim. P. 11(a)(2), Hatfield's right to appeal the district court's denial of his motion to suppress. The district court accepted Hatfield's plea and entered a judgment of conviction against him on November 13, 2001, in which the court sentenced Hatfield to two concurrent thirty-six month terms of imprisonment. Hatfield timely filed a notice of appeal to challenge the district court's denial of his motion to suppress.

## II

In reviewing the decision of a district court to deny a motion to suppress, "we accept its factual findings unless clearly erroneous and view the evidence in the light most favorable to the government." United States v. Le, 173 F.3d 1258, 1264 (10th Cir. 1999). "It is the province of the trial court to assess the credibility of witnesses at the suppression hearing and to determine the weight to be given to the evidence presented, and we must give such determinations due deference." Id. Nevertheless, "'[t]he ultimate determination of reasonableness under the Fourth Amendment . . . is a question of law which we review de novo, considering the totality of the circumstances.'" Id. (quoting United States v. Hargus, 128 F.3d 1358, 1361 (10th Cir. 1997)).

On appeal, Hatfield reframes the challenge he made below to the seizure of evidence at his home. He drops the arguments that the anonymous tip did not justify the knock and talk interview and that the protective sweep through his house constituted an impermissible, warrantless search. Instead, he builds upon his argument made to the district court that Harrold conducted an unconstitutional search of the back yard while standing in the pasture. Before us Hatfield argues that the evidence seized pursuant to the warrant was "fruit of the poisonous tree" because the key fact cited in the affidavit to establish probable cause for the issuance of the search warrant—Officer Harrold's statement that he saw marijuana in plain view in Hatfield's back yard—was based upon two alleged unconstitutional searches. First, Hatfield says that Officer McCullum conducted an unconstitutional search of the back yard of his home during the knock and talk interview, and that his observations of the back yard directed Officer Harrold to examine the chicken coop where the marijuana was discovered during his subsequent search. Second, Hatfield argues that Harrold's observation was an unconstitutional search because Officer Harrold trespassed into Hatfield's adjacent pasture to see into the back yard and the chicken coop. Hatfield urges that because the warrant was issued based upon facts gleaned from these alleged

unconstitutional searches, the evidence seized pursuant to the warrant was fruit of those poisonous trees and it should have been suppressed.[1]

Under the fruit of the poisonous tree doctrine, the exclusionary rule bars the admission of physical evidence and live testimony obtained directly or indirectly through the exploitation of unconstitutional police conduct. Wong Sun v. United States, 371 U.S. 471, 485–88 (1963); United States v. Lin Lyn Trading, Ltd., 149 F.3d 1112, 1116 (10th Cir. 1998). It is clear under the doctrine that if Officer Harrold's observation of the marijuana occurred during or as a result of an unconstitutional search, the evidence seized during the later search conducted pursuant to warrant would be inadmissible as fruit of the poisonous tree. See Murray v. United States, 487 U.S. 533, 542–44 (1988). The core premise of

---

[1]Hatfield also briefly raises the argument that the warrant was defective because it was issued without probable cause. Hatfield fails to fully develop this argument, and, in any event, it has no merit. The facts in Officer Harrold's affidavit are undisputed: an anonymous informant told the Sheriff's Office that Hatfield was growing marijuana behind his house and Officer Harrold personally observed the marijuana. "A magistrate's determination that probable cause exists is entitled to 'great deference,' and 'we ask only whether the issuing magistrate had a 'substantial basis' for determining probable cause existed.'" Le, 173 F.3d at 1265 (quoting United States v. Wittgenstein, 163 F.3d 1164, 1172 (10th Cir. 1998)). We think the facts asserted in the affidavit were sufficient to give the magistrate a "substantial basis" upon which to conclude that the probable cause standard had been met—i.e., that there was "a fair probability that contraband or evidence of a crime [would] be found" at Hatfield's home. Illinois v. Gates, 462 U.S. 213, 238 (1983). The proper framing of Hatfield's legal claim, and the one that we engage in detail in this opinion, is whether the evidence seized pursuant to the warrant should nevertheless be suppressed because that evidence was fruit of prior unconstitutional searches.

Hatfield's fruit of the poisonous tree argument is that Officers McCullum and Harrold conducted unconstitutional searches that acquired information used to obtain the search warrant that led to the seizure of the marijuana. However, because we conclude that neither officer engaged in an unconstitutional search, we reject Hatfield's argument and affirm the district court's denial of Hatfield's motion to suppress.

**A**

Hatfield claims that McCullum, while standing within the curtilage of Hatfield's home, conducted an unconstitutional search of the backyard during the knock and talk interview and passed on what he learned to Officer Harrold. Hatfield argues that he had a reasonable expectation of privacy in his backyard and McCullum's inspection of it without a warrant constituted a search in violation of the Fourth Amendment. We find this argument unavailing.

Even if Officer McCullum could have observed the marijuana growing in Hatfield's back yard from his vantage point on the parking pad, it would not have amounted to an impermissible search. "[W]hen the police come on to private property to conduct an investigation . . . and restrict their movements to places visitors could be expected to go (e.g., walkways, driveways, porches), observations made from such vantage points are not covered by the Fourth Amendment." 1 Wayne R. LaFave, Search & Seizure: A Treatise on the Fourth

- 11 -

Amendment §2.3(f), at 506–08 (3d ed. 1996) (footnotes omitted); see also United States v. Reyes, 283 F.3d 446, 465–67 (2d Cir. 2002) (holding that it is not a Fourth Amendment violation for officers standing on driveway to observe marijuana growing in the yard); United States v. Smith, 783 F.2d 648, 650–52 (6th Cir. 1986) (holding that Fourth Amendment was not violated when, before applying for a state search warrant, a detective drove seventy-five to one hundred yards up defendant's unobstructed driveway to investigate informant's tip that a large marijuana plant was growing by the house); State v. Merrill, 563 N.W.2d 340, 344 (Neb. 1997) (holding that because "any member of the public could have entered upon Merrill's property in the same manner the officers did," the observation of marijuana in plain view from the driveway was not a search under the Fourth Amendment).

In the instant case, Hatfield's driveway was open to the public, permitting the Officers to park their patrol car directly behind Hatfield's pickup. The openness and accessibility of a driveway to the public has been an important factor that courts have used to conclude that an owner does not have a reasonable expectation of privacy and that police observations made from the driveway do not constitute a search. See, e.g., Reyes, 283 F.3d at 465 (noting that "'driveways that are readily accessible to visitors are not entitled to the same Fourth Amendment protection as are the interiors of defendants' houses'") (quoting

United States v. Reilly, 76 F.3d 1271, 1279 (2d Cir. 1996)); Smith, 783 F.2d at

651 ("The fact that a driveway is within the curtilage of a house is not

determinative if its accessibility and visibility from a public highway rule out any

reasonable expectation of privacy."); 1 LaFave, supra, § 2.3(f) at 507 n.197

(collecting cases that emphasize the public accessibility of driveways in courts'

conclusions that Fourth Amendment protections did not apply).  Officer

McCullum did not leave the parking pad, and when he heard that Officer Sinclaire

was speaking to Hatfield, he retreated to a point from which he could observe

their conversation while keeping in view the side of the house adjacent to the

parking pad.  Thus, any observations made by Officer McCullum while standing

on Hatfield's driveway do not constitute a search under the Fourth Amendment.[2]

---

[2]We note, furthermore, that the record is clear that Officer McCullum did not see any marijuana from his vantage point on the driveway.  At most, he might have seen the chicken coop in the back yard.  We do not see, therefore, how any observations made by Officer McCullum would have influenced Officer Harrold's later decision to investigate the back yard himself from the adjoining pasture and have tainted Harrold's observation.  Hatfield suggests that Officer Harrold would not have inspected the chicken coop if Officer McCullum had not told him about it.  But Harrold knew that the anonymous tip had specifically indicated that the marijuana was in Hatfield's back yard.  Harrold knew, because the anonymous tip directed the officers to the back yard, that if he were to look for marijuana he would look behind the house.

**B**

We turn next to Hatfield's contention that Officer Harrold's inspection of Hatfield's back yard from the pasture was an unconstitutional search. He argues that the "open fields" doctrine does not apply to the pasture adjacent to his yard and, accordingly, Officer Harrold's presence in the field without a warrant violated the Fourth Amendment. We disagree that Officer Harrold's observation of the marijuana constituted an unconstitutional search.

"The touchstone of Fourth Amendment analysis is whether a person has a 'constitutionally protected reasonable expectation of privacy.'" California v. Ciraolo, 476 U.S. 207, 211 (1986) (quoting Katz v. United States, 389 U.S. 347, 360 (1967) (Harlan, J., concurring)). Usually, we determine whether a person has a constitutionally protected reasonable expectation of privacy by making two inquiries: first has the person exhibited a subjective expectation of privacy in the place or thing searched? Katz, 389 U.S. at 361 (Harlan, J., concurring). Second, is the person's expectation of privacy one that society is prepared to recognize as reasonable? Id.

The "prototypical . . . area of protected privacy" is the interior of a home. Kyllo v. United States, 533 U.S. 27, 35 (2001). Linked to that core area of protected privacy is a home's curtilage. "At common law, the curtilage is the area to which extends the intimate activity associated with the sanctity of a man's

home and the privacies of life, and therefore has been considered part of [the] home itself for Fourth Amendment purposes." Oliver v. United States, 466 U.S. 170, 180 (1984) (internal quotation marks and citations omitted). In contrast, "open fields do not provide the setting for those intimate activities that the [Fourth] Amendment is intended to shelter from government interference or surveillance," id. at 179, and "the government's intrusion upon the open fields is not one of those 'unreasonable searches' proscribed by the text of the Fourth Amendment."[3] Id. at 177; see also Hester v. United States, 265 U.S. 57, 59 (1924) ("[T]he special protection accorded by the Fourth Amendment to the people in their 'persons, houses, papers, and effects,' is not extended to the open fields. The distinction between the latter and the house is as old as the common law.").

In this case, the location of the marijuana observed by Officer Harrold was in a well-defined yard behind Hatfield's residence, in and among several small structures standing close to the back of the house. The area could not be observed clearly from the street, as illustrated by the fact that Officer Harrold was not certain that he had seen marijuana when he looked into the backyard from a position west of the house on the county road. We hold that the marijuana was

---

[3]"[T]he term 'open fields' may include any unoccupied or undeveloped area outside of the curtilage. An open field need be neither 'open' nor a 'field' as those terms are used in common speech." Oliver, 466 U.S. at 180 n.11.

located in the curtilage of Hatfield's home because "the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." United States v. Dunn, 480 U.S. 294, 301 (1987). Officer Harrold, however, never physically invaded the curtilage when he observed the marijuana. The question before us, therefore, is whether an observation of the curtilage by the police from a vantage point in an adjacent open field violates an expectation of privacy that is reasonable.

Although privacy in the interior of a home and its curtilage are at the core of what the Fourth Amendment protects, there is no reasonable expectation that a home and its curtilage will be free from ordinary visual surveillance. "The Fourth Amendment protection of the home has never been extended to require law enforcement officers to shield their eyes when passing by a home on public thoroughfares." Ciraolo, 476 U.S. at 213. In Ciraolo, the Supreme Court held that it was not a search in violation of the Fourth Amendment for police officers to make naked-eye observations into a fenced yard that was within the curtilage of a home from a plane flying 1,000 feet above the property. Id. at 213–14. The Court held that the homeowner did not have a reasonable expectation of privacy from such observations. Id. at 214. The Court reasoned that although the yard was fenced and thus not visible from ground level, it was exposed to persons flying above the property or to "a power company repair mechanic on a pole

- 16 -

overlooking the yard," id. at 215, and "'[w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection.'" Id. at 213 (quoting Katz, 389 U.S. at 351). Thus, Hatfield would have had no expectation of privacy from Officer Harrold's observation of the marijuana had Harrold been standing on property owned by Hatfield's neighbor when he made it, for in that situation Hatfield would have exposed the marijuana to the view of his neighbors and anyone they invited onto their land. See, e.g., 1 LaFave, supra, § 2.3(g) at 512–13 ("Certainly no justified expectation [of privacy] is present when the physical facts are such that the incriminating objects or activities were readily visible to persons on neighboring lands.") (citing United States v. Campbell, 395 F.3d 848 (4th Cir. 1968)).

In the instant case, of course, Officer Harrold was not standing on a neighbor's property or on a public thoroughfare when he saw the marijuana in Hatfield's yard. The observation was made from Hatfield's own pasture, and Hatfield makes much of the fact that Officer Harrold was trespassing in the pasture and in Oklahoma trespassing is a crime. The crux of the issue before us, then, is whether the fact that the pasture was owned by Hatfield himself, and that persons in the field are trespassers, created a reasonable expectation of privacy from observations of Hatfield's curtilage made from the pasture. We conclude that the Supreme Court's decision in Dunn and our decision in Fullbright v.

- 17 -

United States, 392 F.2d 432, 433–35 (10th Cir. 1968), dictate that the answer to that question is "no."

In <u>Dunn</u>, the Court upheld a search by two trespassing officers in which they stood on the defendant's property outside of a barn, looked in through an open space in the main doorway of the barn, and discovered drug paraphernalia. 480 U.S. at 297, 304. The Court first concluded that the barn was not situated within the curtilage of the residence, which was located more than fifty yards from the barn and surrounded by its own fence. <u>Id.</u> at 301–03. Thus, the officers were standing upon the defendant's open field and a warrant was not required to justify their presence. <u>Id.</u> at 304.

The Court then addressed the question of whether it was a Fourth Amendment violation for the officers, while standing in an open field, to search the interior space of the barn by looking into it. Assuming, but not deciding, that the interior space of the barn was protected by the Fourth Amendment, <u>id.</u> at 303, the Court held that it was nevertheless permissible for the officers to visually examine the interior of the barn without a warrant from a vantage point in an open field. <u>Id.</u> at 304–05. The Supreme Court explained that under its precedents, "there is no constitutional difference between police observations conducted while in a public place and while standing in the open fields." <u>Id.</u> at 304.

Therefore, that which is in plain view from an open field may be observed by the police without it being a search under the Fourth Amendment.

Furthermore, the Court said that, "the fact that the objects observed by the officers lay within an area that we have assumed . . . was protected by the Fourth Amendment does not affect our conclusion." Id. The Court emphasized that "the officers never entered the barn, nor did they enter any other structure on respondent's premises." Id. Instead, "[o]nce at their vantage point, they merely stood, outside the curtilage of the house and in the open fields upon which the barn was constructed, and peered into the barn's open front." Id. Thus, "standing as they were in the open fields, the Constitution did not forbid them to observe the [drug] laboratory located in respondent's barn." Id.

Similarly, Fullbright involved law enforcement officers who, while trespassing on the defendant's open fields, observed from a distance the interior of an open shed located in the property's curtilage. 392 F.2d at 433–34. We held the officers' observation of an illegal distilling operation in the shed was not a search prohibited by the Fourth Amendment. Id. at 434. We explained, however, that "[i]f the investigators had physically breached the curtilage there would be little doubt that any observations made therein would have been proscribed. But observations from outside the curtilage of activities within are not generally interdicted by the Constitution." Id; see also 1 LaFave, supra, § 2.3(g), at 515

- 19 -

(reasoning that police observation of incriminating objects or activity "is unobjectionable—even if what is seen is itself within the protected area called the 'curtilage'—if the police vantage point was itself in the 'open fields'").

Following Dunn and Fullbright, we hold that police observation of a defendant's curtilage from a vantage point in the defendant's open field is not a search under the Fourth Amendment. Even though we can conclude that Hatfield had a subjective expectation of privacy in the space immediately behind his house, this is not an expectation of privacy that society regards as reasonable, at least with respect to visual observations made from an adjoining open field. Had Officer Harrold physically invaded the curtilage to make his observation, that would have constituted a search subject to the proscriptions of the Fourth Amendment. See Dunn, 480 U.S. at 304; Fullbright, 392 F.2d at 434. But there is no reasonable expectation of privacy from visual observations made by the police from the open fields because "an individual has no legitimate expectation that open fields will remain free from warrantless intrusion by government officers."[4] Oliver, 466 U.S. at 181. Indeed, the police can enter open fields at

_____

[4]We note, however, that some police observations made from an open field could constitute an unconstitutional search. For example, in Kyllo, the Supreme Court held that "obtaining by sense-enhancing technology any information regarding the interior of the home that could not otherwise have been obtained without physical intrusion into a constitutionally protected area constitutes a search—at least where (as here) the technology in question is not in general

(continued...)

any time for investigative purposes without violating the Fourth Amendment. See United States v. Pinter, 984 F.2d 376, 379 (10th Cir. 1993) ("The open fields doctrine does not require that law enforcement officials have some objective reason—either probable cause or reasonable suspicion—before entering an open field.").

Hatfield relies heavily on the fact that Officer Harrold's presence in the pasture violated Oklahoma's criminal trespass statute. This fact does not, however, change our analysis. The Oklahoma criminal trespass statute to which Hatfield points, Okla. Stat. Ann. tit. 21, § 1835 (West 2000), has been on the books in one form or another since 1913. See id. (Historical and Statutory Notes). Despite the law's longevity, we have never found it to be relevant to Fourth Amendment analysis of whether an officer was properly in an open field in cases arising in Oklahoma. For example, the relevant provision of the statute that was in force during the events of the instant case was also in force in 1993 when we decided Pinter. In Pinter, two DEA agents trespassed onto the defendant's oil

_____

[4](...continued)
public use." 533 U.S. at 34 (internal quotation marks and citations omitted). In Kyllo, law enforcement officers used a thermal imaging device from a vantage point on a public street to scan the exterior of a home for signs that high-intensity lamps were being used to grow marijuana. Id. at 30. This type of observation, the Court concluded, constituted an impermissible warrantless search. Id. at 40. It would likewise be a search if a thermal imaging device like the one at issue in Kyllo were used from a position in an open field. The instant case, however, only involves visual observations made by police, unaided by any invasive technology.

lease in Oklahoma while surveilling him. 984 F.2d at 377–79. After stating that the open fields doctrine applied in that case, and making no mention of the fact that trespass is a crime in Oklahoma, we stated that, "The fact that the officers trespass onto private property does not transform their actions into a 'search' within the meaning of the fourth amendment." Id. at 379. Nor did we consider the fact that trespass is a crime in Oklahoma when we decided Fullbright. 392 F.2d at 433–35 (10th Cir. 1968) (applying open fields doctrine to trespassing federal agents without any reference to the fact that trespass was a crime in Oklahoma). Consistently with these cases, we explicitly hold that the fact that a state may have chosen to protect the property interests of its citizens by making trespass a crime under state law does not affect the analysis of a person's Fourth Amendment interest. See Oliver, 466 U.S. at 183.

For the foregoing reasons, we conclude that Hatfield did not have a constitutionally protected privacy interest in being free from police observations of his curtilage made from his adjoining pasture. Officer Harrold's sighting of the marijuana in Hatfield's back yard therefore did not constitute a Fourth Amendment search.

### III

We hold that neither the actions of Officer McCullum nor the actions of Officer Harrold constituted an impermissible search. Accordingly, the affidavit

supporting the search warrant did not contain tainted factual allegations, and the evidence seized pursuant to the warrant was not fruit of a poisonous tree.  We therefore AFFIRM the district court's decision denying the motion to suppress.