EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| El Pueblo de Puerto Rico<br><br>Peticionario<br><br>v.<br><br>Jaime Soto Soto<br><br>Recurido | Apelación<br><br>2006 TSPR 87<br><br>168 DPR _____ |

Número del Caso: CC-2003-472

Fecha: 22 de mayo de 2006

Tribunal de Apelaciones:

>  Circuito Regional IV de Aguadilla y
>  Mayagüez Panel I

Juez Ponente:

>  Hon. Roberto L. Córdova Arone

Oficina del Procurador General:

>  Lcda. Lisa M. Durán Ortiz
>  Procuradora General Auxiliar

Abogado de la Parte Recurrida:

>  Lcdo. Dixon Cancel Mercado

Materia: Artículo 401, 404, 412 Sustancias Controladas

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

El Pueblo de Puerto Rico

    Peticionario

       v.

Jaime Soto Soto                   CC-2003-472

    Recurrido

Opinión del Tribunal emitida por la Juez Asociada señora Rodríguez Rodríguez

San Juan, Puerto Rico, a 22 de mayo 2006

En esta ocasión tenemos la oportunidad de dilucidar si la entrada de un agente del orden público a un camino vecinal de carácter privado para realizar unas gestiones de vigilancia, en las que utilizó unos binoculares, constituyó un registro irrazonable en violación de la Constitución del Estado Libre Asociado de Puerto Rico.

I

El 1ro de mayo de 2001, el agente Joel Soto Ramírez recibió una confidencia anónima en la que se indicó que el Sr. Jaime Soto Soto, residente del Bo. Espino de Añasco, continuaba vendiendo sustancias controladas desde su residencia. El informante

describió físicamente al sospechoso y la ubicación de su residencia. En específico, informó que el sospechoso "continuaba viviendo en la misma residencia que está ubicada al pasar el negocio el Arcoiris, la primera entrada a la izquierda entre dos casas pintadas de color crema." Ese mismo día, alrededor de las 1:30 de la tarde, el agente Soto Ramírez se personó al lugar indicado. En su declaración jurada señaló que se retiró sin ser detectado y dos horas más tarde regresó.

Una vez en el lugar, el agente se ubicó en el camino vecinal bajo un árbol de almendro desde donde tenía plena visibilidad del frente de la residencia. Allí permaneció en un vehículo oficial, no identificado. Según el agente, comenzó una vigilancia discreta utilizando unos binoculares de su propiedad. Alrededor de las 4:20 de la tarde observó que llegó a la residencia un joven montado sobre un caballo. Éste se desmontó del mismo y caminó hacia la puerta de la casa. Del interior de la misma salió el sospechoso y, estando ambos fuera de la residencia, el agente presenció una transacción de drogas.

Al día siguiente, el agente Soto Rivera volvió a la vecindad de la residencia del recurrido para continuar con su investigación. Ese mismo día, y poco después del mediodía, el agente se situó en el mismo lugar del día anterior, a unos 100 a 150 pies de distancia de la residencia del sospechoso. Estando situado en ese lugar observó mediante el uso de binoculares dos transacciones de

drogas que se efectuaron frente a la marquesina de la residencia del sospechoso.

El agente Soto Rivera prestó declaración jurada sobre estos hechos. En virtud de la misma, el Tribunal de Primera Instancia expidió una orden para allanar la residencia del recurrido el 8 de mayo de 2001. El allanamiento se realizó el siguiente 11 de mayo y producto del mismo se ocuparon sustancias controladas.[1] Posteriormente, se presentaron las acusaciones correspondientes.

Oportunamente, el acusado solicitó la supresión de la evidencia incautada. En específico, alegó que las gestiones investigativas que realizó el agente Soto Ramírez, cuyo resultado dio base para la expedición de la orden de allanamiento, constituyeron un registro e invasión a su privacidad. Ello, por razón de que el lugar desde el cual se realizaron las mismas era propiedad privada y el agente no tenía autorización para estar allí. Alegó, además, que la orden de allanamiento se obtuvo mediante una declaración jurada falsa y estereotipada. El Ministerio Público replicó a la moción de supresión de evidencia y expresó que las observaciones fueron hechas fuera de la residencia del peticionario, en un lugar público.

---

[1] Según el testimonio de los agentes, cuando éstos se disponían a diligenciar la orden de allanamiento en la casa del señor Soto Soto, éstos se percataron de que se estaba realizando una transacción de drogas frente a la residencia. En consecuencia, arrestaron también al señor Jaime Soto Castro, José Vázquez y José Colón.

A solicitud de la defensa, el Tribunal de Primera Instancia realizó una inspección ocular del lugar de los hechos. El tribunal consignó que se trataba de un vecindario rural que se compone de siete a ocho casas a las cuales se tiene acceso por dos entradas. La calle está asfaltada, aunque en malas condiciones y la entrada de la calle estaba precedida por unas cadenas. El tribunal describió que las casas estaban bastante cerca una de las otras y el árbol de almendro ubica en un área visible.

Posteriormente, el tribunal celebró la correspondiente vista de supresión de evidencia. En la misma, el señor Soto Soto testificó que su residencia está enclavada en una finca privada perteneciente a su familia, la cual es compartida por siete casas adicionales. El agente Soto Ramírez declaró que tras recibir la confidencia se dirigió al lugar de referencia y entró al mismo por una calle vecinal. Sostuvo que cuando realizó sus gestiones investigativas no existían las referidas cadenas o alguna otra señal que indicara que el área era privada. Afirmó, también, que desconocía que los vecinos del lugar fueran miembros de una misma familia.

Asimismo, el sargento Luis Carrero, de la división de drogas de Mayagüez, testificó que conocía el lugar y que anteriormente se habían efectuado vigilancias dentro del vecindario y nunca había visto signos que indicaran que el área fuese privada. Además, se presentó prueba de que en el área se hace recogido de basura y el camino tiene postes

de alumbrado y líneas eléctricas.[2]    El Ministerio Público, al igual que la defensa, sometieron en evidencia sendas fotografías del vecindario donde ubica la residencia del recurrido.

Luego de aquilatar la prueba, el Tribunal de Primera Instancia declaró no ha lugar la moción de supresión de evidencia presentada por el acusado.    En su resolución, el foro de primera instancia dio entero crédito al testimonio del agente Soto Ramírez quien al hacer las vigilancias creía de buena fe que el lugar era público.    Dicho foro estableció, además, que el testimonio del agente no fue controvertido en su esencia y que de la inspección ocular que se realizó se pudo corroborar que tal testimonio era creíble y físicamente posible.

Inconforme, el señor Soto Soto acudió ante el antiguo Tribunal de Circuito de Apelaciones.[3]    En la sentencia dictada el foro apelativo concluyó que el Tribunal de Primera Instancia erró al denegar la moción de supresión de evidencia.    El foro intermedio basó su decisión en los siguientes fundamentos, a saber, que: (a) la vigilancia

---

[2]    En la vista de supresión de evidencia testificaron también los agentes Manuel Caraballo Vázquez y José L. Chaparro, quienes declararon sobre el diligenciamiento de la orden de allanamiento; Milton Acosta Ortiz, quien practicó las pruebas de campo; y la químico Mabel Ruiz.

[3]    Mediante sentencia del 5 de septiembre de 2002, el entonces Tribunal de Circuito de Apelaciones desestimó el recurso presentado por falta de jurisdicción.    El 6 de marzo de 2003 revocamos el referido dictamen mediante sentencia y devolvimos los autos al foro apelativo intermedio para la continuación de los procedimientos.

mediante binoculares realizada dentro de la propiedad del acusado, sin autorización de éste o de alguna otra persona con la legitimación para concederla, es de por sí una invasión a la intimidad y un registro ilegal; y, (b) el uso de binoculares para observar la residencia del acusado constituyó un registro *per se* para lo cual se carecía de orden, por lo que la información obtenida mediante tal mecanismo también se obtuvo de manera ilegal y debía suprimirse.

El tribunal intermedio apelativo sostuvo que el recurrido tenía una expectativa razonable de intimidad sobre el lugar por lo que el agente Soto Soto necesitaba autorización de la familia o una orden judicial para entrar a la propiedad privada y realizar su investigación.

Inconforme con tal determinación, el Procurador General acudió ante nosotros mediante un recurso de *certiorari* y señaló la comisión de dos errores.[4]

---

[4] Los errores señalados fueron:

> Erró el Tribunal de Circuito de Apelaciones al darle excesiva importancia al supuesto carácter privado y la alegada presencia de cadenas en la entrada del camino desde el cual el agente investigador prestó investigación y determinar en consecuencia que su intervención fue injustificada e irrazonable, ello a pesar de que el Ministerio Público demostró mediante fotos que no existía tal expectativa a la intimidad cuando el camino vecinal privado tiene libre acceso al público en general, y que estas cadenas no estuvieron mientras se realizó la vigilancia y el posterior diligenciamiento de la orden de allanamiento, según lo declarado por el agente del orden público, el cual le mereció entero crédito al Tribunal de Primera Instancia.

> Erró el Tribunal de Circuito de Apelaciones al declarar con lugar la supresión de evidencia bajo

Oportunamente expedimos el auto solicitado. Ambas partes han comparecido por lo que estamos en posición para resolver y pasamos a así hacerlo.

## II

Nuevamente nos debemos dar a la tarea de lograr el debido equilibrio entre dos importantes intereses que convergen en nuestra sociedad y suelen colisionar entre sí. Por un lado, la garantía individual contra registros y allanamientos irrazonables producto de los conceptos de libertad y dignidad inherentes al ser humano[5], y el deber

---

el fundamento equivocado de que el Tribunal de Primera Instancia no dirimió la credibilidad del agente investigador, cuando en la Resolución del Tribunal de Primera Instancia, éste concluyó enfáticamente que los testimonios de los agentes fueron creíbles y físicamente posibles. Particularmente, el Tribunal de Primera Instancia concluyó que el testimonio del agente investigador no fue controvertido por testimonio alguno o evidencia del acusado. Tampoco se impugnó la credibilidad de éste. Por consiguiente, el Tribunal de Primera Instancia actuó correctamente al no descartar el testimonio del agente Soto Ramírez.

[5] En el Art. II, Sec. 10, de la Constitución del Estado Libre Asociado de Puerto Rico, dispone lo siguiente:

No se violará el derecho del pueblo a la protección de sus personas, casas, papeles y efectos contra registros, incautaciones y allanamientos irrazonables. [...] Sólo se expedirán mandamientos autorizando registros, allanamientos o arrestos por autoridad judicial, y ello únicamente cuando exista causa probable apoyada en juramento o afirmación... Evidencia obtenida en violación de esta sección será inadmisible en los tribunales.

En Puerto Rico, la protección constitucional contra registros y allanamientos irrazonables surge además del Art. II, Sec. I de la Constitución que declara la inviolabilidad de la dignidad del ser humano y del Art. II, Sec. 8 que expresamente dispone que "toda persona tiene derecho a protección de ley contra ataques abusivos a su

del Estado de combatir y prevenir la criminalidad procurando una mejor calidad de vida para sus ciudadanos.

Al efectuar este fino balance debemos adoptar criterios claros que permitan reconciliar los intereses involucrados sin perder de vista los valores enraizados en nuestro pueblo, y sin procurar interpretaciones que se erijan como obstáculos a la labor del Estado en su lucha contra el crimen. Véase, *Pueblo v. Muñoz* Santiago, 131 D.P.R. 965 (1992); *Pueblo v. Pérez Pérez*, 115 D.P.R. 827 (1984). Después de todo, los Constituyentes indicaron de modo expreso y claro que las garantías constitucionales como el derecho a la intimidad, "[tienen] su límite en la conducta criminal." 4 *Diario de Sesiones de la Convención Cosntituyente*, págs. 2567-2568. Véase además, *Pueblo v. Santiago Feliciano,* 139 D.P.R. 361 (1995); *Pueblo v. Martínez Torres*, 120 D.P.R. 496 (1988).

En el presente caso, el recurrido sostiene que procede suprimir la evidencia incautada por cuanto el lugar desde donde el agente observó la alegada transacción ilegal de drogas era propiedad privada y éste no estaba autorizado a estar en ese lugar, por lo que sus observaciones constituyen un registro irrazonable. Consiguientemente, no procedía expedir una orden de registro y allanamiento a base de las mismas. Sostiene además que la utilización de unos binoculares para observar hacia su residencia

honra, a su reputación y a su vida privada o familiar." Véase, E. Chiesa, Derecho *Procesal Penal de Puerto Rico y Estados Unidos*, T. I, Vol. I, Forum, 1991, pág. 408.

constituyó, *per se,* un registro irrazonable.  El Tribunal de Apelaciones avaló la posición del recurrido.

El Procurador General por su parte,  sostiene que no se violó la protección constitucional toda vez que el recurrido no tenía una expectativa razonable de intimidad respecto el camino vecinal desde donde el agente hizo sus observaciones, a pesar de la naturaleza privada de dicha área, toda vez que el lugar específico donde se ubicó el agente debe considerarse campo abierto y no parte de las inmediaciones o *curtilage* de la residencia del recurrido.

Planteada la controversia bajo estos términos, pasemos a analizar la misma.

### III

### A.

La protección contra registros e incautaciones irrazonables protege a las personas y no a los lugares. *Pueblo v. Ortiz Rodríguez*, 147 D.P.R. 433, 440 (1999).  El alcance de la protección constitucional dependerá de si la persona afectada alberga subjetivamente una expectativa legítima de intimidad en un lugar y es razonable que abrigue tal expectativa.  Ello constituye la piedra de toque de esta doctrina constitucional.  *Pueblo v. Bonilla Bonilla*, 149 D.P.R. 318 (1999).  Véase además, *California v. Ciraolo*, 476 U.S. 207, 211 (1986); *Katz v. United States,* 389 U.S. 347, 360 (1967) (Harlan, J., Op. Concurrente).

En este análisis hay que determinar si las acciones de la persona afectada demuestran inequívocamente "la

intención de alojar dicha expectativa." *Pueblo v. Ortiz Rodríguez*, 147 D.P.R. 433, 442 (1999). Y, además, si bajo las circunstancias del caso en particular es razonable socialmente tener tal expectativa. *Loc. cit.* En *Oliver v. United States*, 466 U.S. 170, 181-183 (1984), el Tribunal Supremo de los Estados Unidos definió esta última interrogante de la siguiente manera: "The test of legitimacy is not whether the individual chooses to conceal assertedly 'private' activity [but instead] whether the government's intrusion infringes upon the personal and societal values protected by the Fourth amendment." Véase, E. Chiesa, Derecho *Procesal Penal de Puerto Rico y Estados Unidos*, Forum, 1991, T. I, Vol. I,  pág. 345.

El interior del hogar es, sin duda, la zona sobre la cual una persona legítimamente tiene la mayor expectativa de intimidad.[6] Entrelazado a este núcleo de protección se encuentra el área circundante al hogar, lo que se conoce en la doctrina como la inmediación o *curtilage*. Así, en *Pueblo v. Rivera Colón*, 128 D.P.R. 672 (1992), sostuvimos que la protección contra registros y allanamientos

---

[6] Hay que acotar sin embargo, que aun cuando existe una expectativa razonable de intimidad en el hogar o sus inmediaciones, ello no quiere decir que tal área está cobijada por un manto de total inmunidad a la observación casual u ordinaria que pueda hacer un agente del orden público. *E.g., California v. Ciraolo,* 476 U.S. 207, 213("The Fourth Amendment protection of the home has never been extended to require law enforcement officers to shield their eyes when passing by a home on public thoroughfares.") Después de todo, lo que se expone a la vista públicamente aunque sea en el hogar, no está protegido por la prohibición constitucional contra registros y allanamientos irrazonables.

irrazonables se extiende más allá de una residencia para incluir la zona contigua a ésta. Esta zona protegida comprende, "la zona contigua a la casa, compuesta por el terreno y las estructuras accesorias." *Rivera Colón*, 128 D.P.R. pág. 683. Esta área goza de protección constitucional porque se estima que a ella se extiende la actividad íntima del hogar y de la persona, por lo que debe considerarse parte de la residencia para efectos de la prohibición contra registros y allanamientos irrazonables. *Pueblo v. Ortiz Rodríguez, ante*, pág. 444. Véase además, *Oliver v. United States*, *ante*, pág. 180 ("curtilage is the area to which extends the intimate activities associated with the sanctity of a man´s home and the privacies of life and therefore has been considered part of the home itself for Fourth Amendment purposes.")[7]

Sin embargo, esta protección no es extensiva a las zonas que se encuentran fuera del *curtilage,* es decir, las que forman parte del campo abierto, ya que a esta área no se extienden aquellas actividades íntimas del individuo que están protegidas de intromisión por parte del Estado y sus agentes. *Rivera Colón, ante.* Véase por ejemplo, *Oliver*

---

[7] Históricamente, el concepto de *curtilage* se extrapoló a la jurisprudencia de la Enmienda Cuarta de la Constitución de los Estados Unidos, del delito de robo domiciliario del Derecho Común Anglosajón. Blackstone señala: "And if the barn, stable or warehouse, be parcel of the mansion house, though not under the same roof or contiguous, a burglary may be committed therein; for the capital house protects and privileges all its branches and appurtenants, if within the curtilage or the homestall." Blackstone, 4 *Commentaries on the Laws of England*, 225. Ciertamente, en la Inglaterra del Siglo XVIII era relativamente sencillo identificar el *curtilage* porque era colineal con la verja que rodeaba la mayoría de las viviendas.

*ante,* pág. 177 (1984)("the government´s intrusion unto the open fields is not one of those 'unreasonable searches' proscribed by the text of the Fourth Amendment."); *Hester v. United States*, 265 U.S. 57, 59 (1924)("the special protection accorded by the Fourth Amendment to the people in their 'persons, houses, papers, and effects' is not extended to the open fields. The distinction between the latter and the house is as old as the common law.")

De ordinario entonces, observaciones hechas por unos agentes del orden público desde fuera del *curtilage* de actividades o eventos que se desarrollen en el *curtilage*, no está prohibida por la Constitución. Aunque ciertamente, ello no implica que toda observación pase el crisol constitucional. Véase discusión *infra.*

En *Rivera Colón*, *ante*, reconocimos que puede ser difícil determinar hasta dónde se extiende el área circundante o *curtilage*. Entendido el contexto de donde proviene el concepto *curtilage*, es natural la dificultad que el mismo entraña a la hora de delimitar su extensión.

Como resultado de esta dificultad hemos sido reacios a adoptar una línea de demarcación específica para el *curtilage*.[8] Así, en *Rivera Colón, ante*, citando con

---

[8] Sobre esta dificultad se ha señalado: "The problem with curtilage is partially an architectural one. England´s landscape architecture is different from America´s landscape, making it difficult for our courts to translate the curtilage doctrine into the America context." Peters, Fourth Amendment Yard Work: Curtilage´s Mow-Line Rule, 36 *Stan. L. Rev.* 943, 963 (2004). Véase además, *Wright v. State*, 77 S.E. 657, 658 (Ga. Ct. App. 1913)("it was unfortunate that this term 'curtilage', found in the English statutes defining the offense of burglary, and

aprobación el estándar cuatripartito enunciado en *United States v. Dunn*, 480 U.S. 294 (1987), sostuvimos que para determinar si un lugar puede ser considerado como parte del *curtilage* hay que sopesar los siguientes factores: (1) proximidad a la residencia de la zona reclamada como *curtilage*, si está muy próxima es mucho más probable que el área sea considerada como tal; (2) si el área se encuentra dentro de los linderos de la casa; (3) la naturaleza y uso de la zona; y (4) las medidas adoptadas por el residente para protegerla de observaciones que puedan hacer los transeúntes que por allí pasan. Véase también, *Pueblo v. Meléndez Rodríguez*, 136 D.P.R. 587 (1994). Hemos señalado que estos factores deben analizarse conjuntamente pues ninguno de ellos por si sólo resulta determinante. *Pueblo v. Bonilla*, ante, págs. 330-331. Véase, Lawrence, Curtilage or Open Fields?: *Oliver v. United States* Gives Renewed Significance to the Concept of Curtilage in Fourth Amendment Analysis, 46 *U. Pitt. L. Rev*. 795 (1985)

Al aplicar los criterios antes mencionados a los hechos de este caso concluimos que el lugar donde se encontraba el agente de la policía no formaba parte del *curtilage* de la residencia del acusado. Primeramente, el lugar donde se apostó el agente para hacer su observación --el camino vecinal-- quedaba a una distancia de

_____

which applies to the dwelling and the houses surrounding the dwelling-house in England, should have been perpetuated in the statutes of different States; for the term is not strictly applicable to the common disposition of enclosures and buildings constituting the homestead of the inhabitants of this country.")

aproximadamente 100 pies de la residencia del acusado. Segundo, ésta es un área abierta donde, debido a la configuración de los lotes de terreno, no se pueden delimitar los linderos de los lotes. Ello así, entre otras razones, debido a que las residencias que allí ubican no están cercadas.

Finalmente y conforme se desprende de las fotografías admitidas en evidencia y del acta de inspección ocular levantada por el Tribunal de Primera Instancia, el balcón o marquesina donde, alegadamente, se llevaron a cabo las transacciones de drogas es un área abierta. No hay duda que todo lo que ocurra en el balcón o la marquesina puede ser visto por terceros desde las casas cercanas, los patios de éstas, o el camino asfaltado desde donde se hicieron las observaciones.

Al analizar en conjunto todos los criterios identificados en *Rivera Colón*, forzosamente debemos concluir que el lugar desde donde el agente Soto Ramírez hizo sus observaciones no formaba parte del *curtilage* de la residencia del señor Soto Soto. Por el contrario, dicha área se encuentra en lo que se conoce como el campo abierto por lo que de ordinario, las observaciones hechas desde esta área no están sujetas a la prohibición constitucional.

B

La doctrina de campo abierto se refiere a aquellas áreas con carácter privado que están fuera de las inmediaciones de la residencia o terreno circundante que de ordinario están accesibles al público y que por tal accesibilidad no están

cobijadas por una protección constitucional. *Pueblo v.
López*, 129 D.P.R. 287 (1991); *Hester v. United States*, 265
U.S. 57 (1924); *Oliver v. United States*, *ante*, pág. 684.
Véase, Note, Curtilaqe or open fields? *Oliver v. United
States* gives renewed significance to the concept of *Curtilage*
in Fourth Amendment Analysis, 46 *U. Pitt. L. Rev*. 795 (1985).
Es decir, son aquellas áreas que por su accesibilidad al
público, no constituyen el escenario idóneo para la ejecución
de actividades íntimas en sí mismas. *Oliver v. United
States*, *ante*, pág. 179.

En *United States v. Dunn*, *ante*, pág. 304 el Tribunal
Supremo de los Estados Unidos al validar las observaciones
hechas por unos policías quienes se encontraban fuera del
*curtilage* pero dentro de la propiedad privada del acusado,
sostuvo: "[**T**]**here is no constitucional difference between
police observations conducted while in a public place and
while standing in the open fields**." (Énfasis nuestro.)

Antes bien, aun cuando este lugar no forma parte del
*curtilage* y sí del campo abierto*,* debemos de evaluar si, a
la luz de los hechos del caso, la observación del agente
Soto Ramírez viola alguna expectativa de intimidad
razonable del acusado. Éste arguye en la afirmativa bajo
el fundamento que el lugar desde donde se efectuaron las
observaciones era propiedad privada y el agente no estaba
autorizado a entrar al mismo, por lo que el registro fue
irrazonable.

IV

En el caso de autos donde la observación se hizo desde el campo abierto la pregunta que debemos formularnos es si la intromisión del Estado infringe los valores personales y sociales de intimidad protegidos por la prohibición constitucional.

Para definir qué constituye una razonable expectativa de intimidad en este contexto debemos considerar los siguientes siete factores: el lugar registrado o allanado; la naturaleza y grado de intrusión de la intervención policíaca; el objetivo o propósito de la intervención; si la conducta de la persona indicaba una expectativa subjetiva de intimidad; la existencia de barreras físicas que restrinjan la entrada o la visibilidad al lugar registrado; la cantidad de personas que tiene acceso legítimo al lugar registrado; y, las inhibiciones sociales que se relacionen con el lugar registrado. *Pueblo v. Meléndez Rodríguez*, 136 D.P.R. 587, 605 (1994); *Rivera Colón, ante*. Véase además, *Katz, ante*.

De entrada, hay que señalar que el hecho de que el camino donde se apostó el agente Soto Ramírez fuera privado no es, por sí solo, determinante en esta discusión. Como ya señalamos, la protección constitucional contra registros y allanamientos irrazonables protege personas y no lugares. La doctrina que postulaba que los intereses propietarios eran determinantes a la hora de evaluar una actuación del Estado a la luz de esta prohibición constitucional está ya desacreditada. *Katz, ante*, págs. 351-352 y casos allí citados. Véase, *Rakas v. Illinois*, 439 U.S. 128, 144 n. 12

(1978)("even property interest in premises may not be sufficient to establish a legitimate expectation of privacy with respect to particular items located on the premises or activity conducted thereon.")  Véase además, *United States v. Hatfield*, 333 F.3d 1189, 1999 (10th Cir. 2003)("'The fact that the officers trespass onto private property does not transform the actions into a search within the meaning of the fourth amendment' . . . [T]hat a state may have chosen to protect the property interests of its citizens by making trespass a crime . . . does not affect the analysis of a person's Fourth Amendment."); *Commonwealth v. Simmons*, 466 N.E.2d 85 (Mass. 1984).

En el presente caso, el agente entró a las inmediaciones del lugar donde ubica la casa del imputado por uno de los dos caminos que existen en ese barrio.[9] Ubicó allí su auto y desde su interior, utilizando los binoculares, hizo las observaciones que dieron base a la orden de allanamiento expedida.  El camino es uno accesible y abierto al público en general y el mismo se encuentra asfaltado.  No había en dicho lugar ningún letrero que indicara que el lugar era uno privado y por lo tanto se prohibía la entrada.  Tampoco existen barreras naturales que dificulten el acceso al lugar donde se ubicó el agente Soto Ramírez.  Además, desde dicho lugar se podía observar

---

[9] Hay que apuntar sin embargo, que aun cuando hablamos de dos caminos, lo cierto es que según se desprende de las fotografías sometidas en evidencia por el Ministerio Público, una persona puede tener acceso al área de la residencia del recurrido así como al área desde donde se hicieron las observaciones, por distintos lugares ya que este lugar es abierto.

sin restricción alguna y con completa visibilidad la marquesina y el balcón de la residencia del acusado.

El camino se utiliza por el municipio para el recogido de basura así como también es utilizado por la Autoridad de Energía Eléctrica. Sirve de acceso a varias otras residencias que allí ubican, así como a terceros que estén de visita a esas casas. Lo cierto es que toda persona que tenga una razón legítima para entrar al área donde ubica la residencia del recurrido puede utilizar el camino para acceder al lugar. Siendo ello así, los agentes del orden público que estén en gestiones legítimas de investigación tienen también el mismo derecho a utilizar el camino asfaltado.

En este caso, el agente Soto Ramírez se encontraba investigando una confidencia legítima en la que se daba parte de actos ilícitos en la vecindad, entró al lugar a través del referido camino el cual permitía el libre acceso, por lo que, ante este cuadro, podía observar todo lo que ocurriese a plena vista.

En *United States v. Roberts*, 747 F.2d 537, 541-542 (9th Cir. 1984) los agentes penetraron a un camino privado, obervaron unas actividades delictivas y procedieron a arrestar a varias personas y a ocupar cierta evidencia. El camino en *Roberts* era uno compartido por los residentes de las restantes cinco residencias del área y al mismo era de libre acceso. El tribunal resolvió que los agentes del orden público en el curso de una investigación criminal pueden entrar en áreas residenciales que expresamente estén

accesibles al público o que implícitamente estén abiertas a visitantes casuales.[10] Específicamente se indicó:

> A shared unobstructed road is incongruent with the common law concept of the curtilage . . . Used in common with residents of five other houses, the private road is only a means to reach the public road. The private road does not provide the setting for intimate activities of home life. The activities conducted on a road --driving a car, riding a bike, or walking --are impersonal, public activities. Moreover, the road is easily accessible to utility companies and police and fire departments and it is reasonable to assume that the residents would expect these public agencies to use the road in performing their services.

Concluimos por lo tanto que, a la luz de los hechos particulares en este caso, los agentes del orden público podían válidamente estar en el camino vecinal y desde allí observar la residencia del recurrido. El agente Soto Ramírez una vez logró acceso al lugar, circunscribió su vigilancia a aquellas áreas que están abiertas al escrutinio físico o visual de cualquier visitante que estuviera en el lugar. Ciertamente, quien realiza actividades que están accesibles al escrutinio físico o visual de un transeúnte o visitante casual, no puede reclamar expectativa razonable de intimidad acerca de las mismas.

Lo cierto es que el acusado no tomó precaución alguna para mantener en privado las actividades que efectuaba en la marquesina y balcón de su casa. Quien desee mantener en

---

[10] Véase, *People v. Edelbacher*, 766 P.2d 1 (1989); *Commonwelth v. Simmons*, 466 N.E.2d 85 (1984); *Mitchell v. State*, 792 So.2d 192 (Miss. 2001); *State v. Pinkham*, 679 A.2d 589 (1996

secreto una operación de venta ilegal de drogas no puede llevar a cabo sus transacciones a plena vista de terceros. Lejos de albergar una expectativa de intimidad quien así actúa, asume el riesgo que su operación sea descubierta por agentes del orden público. La protección contra registros y allanamientos irrazonables no se puede invocar como gracia divina para salvaguardar al que viole la ley a plena vista y al alcance del que quiera ver u oir. La Carta de Derechos de la Constitución es áncora de libertad no dispensador de inmunidad.

Por tanto, las observaciones realizadas por el agente Soto Ramírez desde el camino vecinal que dieron base para solicitar la orden de allanamiento no configuraron una violación a la garantía constitucional contra registros y allanamientos irrazonables.

V

En el caso de autos existe un elemento adicional que amerita nuestra atención, nos referimos al uso de binoculares por el agente Soto Ramírez en su observación de la residencia del recurrido. Como indicamos anteriormente, el recurrido reclamó que la utilización de los mismos constituye, *per se*, un registro irrazonable.

Hasta ahora, no habíamos tenido oportunidad de evaluar si la utilización de artefactos tecnológicos, en este caso binoculares, varía o incide en el análisis relacionado con la prohibición constitucional contra registros y allanamientos irrazonables.

Al sopesar el planteamiento ante nuestra consideración, partimos de la premisa de que el análisis aplicable es el de expectativa razonable de intimidad que hemos utilizado para determinar si se ha infringido la norma constitucional que prohíbe los registros y allanamientos irrazonables. Además, pesa en nuestro ánimo que el artefacto utilizado en este caso como técnica investigativa es un binocular, aditamento que está fácilmente accesible y disponible al público en general. *E.g.*, *Kyllo v. United States*, 533 U.S. 27 (2001). Tan es así, que el utilizado en este caso era propiedad del propio agente.

En la discusión que antecede concluimos que el recurrido Soto Soto no podía albergar razonablemente una expectativa de intimidad por lo que no se configuró un registro irrazonable. El hecho de que el agente utilizara unos binoculares, como ayuda en su observación, no varía el resultado al que llegamos. La observación hecha con los binoculares es la misma observación que se podía efectuar sin la ayuda de éstos, pues la alegada transacción estaba efectuándose en un lugar a plena vista de terceros y podía observarse fácilmente desde donde se encontraba el agente.

La utilización de instrumentos como los binoculares sirven para preservar la confidencialidad de la investigación en la medida que dificultan que se detecte la presencia del agente del orden público. Además, es un instrumento que contribuye a proteger la seguridad del agente que lleva a cabo la investigación. Estimamos que la

utilización de unos binoculares como técnica investigativa en los albores del Siglo XXI, no ofende los estándares de intimidad que nuestra sociedad estima.

El profesor LaFave en su tratado, W. LaFave, *Search and Seizure: A Treatise on Fourth Amendment*, Thomson – West, 4ta ed., vol. 1, 2004, sec. 2.2(c), pág. 472, avala el análisis antes descrito e indica:

> Under this particular balancing of privacy and law enforcement interests, it is submitted, Fourth Amendment restrictions should not be imposed when the police have done no more than: (1) use binoculars to observe more clearly or carefully that which was into the open and thus subject to some scrutiny by the naked eye from the same location; or (2) use of binoculars to view at a distance that which they could have lawfully observed from closer proximity but for their desire not to reveal the ongoing surveillance.  When this is the nature of the police conduct vis-à-vis evidence or conduct located in the open, the assistance provided by the binoculars should no be characterized as a search.

Véase en igual sentido, *People v. Clark*, 350 N.W.2d 754 (Mich. 1984); *United States v. Lace,* 669 F.2d 46 (2d Cir. 1982); *United States v. Minton*, 488 F.2d 37 (4th Cir. 1973); *United States v. Grimes*, 426 F.2d 706 (5th Cir. 1970). Véase además, Henderson, Nothing New Under the Sun? A Technologically Rational Doctrine of Fourth Amendment Search, 56 *Mercer L.* Rev. 507 (2005); Thueson, Fourth Amendment Search –Fuzzy Shades of Gray: The New "Bright-Line" Rule in Determining when the use of Technology Constitutes a Search, 2 *Wyo. L. Rev.* 9 (2002); Marks, Telescopes, Binoculars, and the Fourth Amendment, 67 *Cornell L. Rev*. 379 (1982).

A base de lo anterior, concluimos que la observación hecha utilizando binoculares no constituye *per se* un registro irrazonable.[11]

Para resumir, en el caso de autos, el agente de la policía estaba en un lugar en el que podía estar sin ofender la garantía constitucional, es decir en el campo abierto; de ahí observó la marquesina y balcón de la casa del acusado con la ayuda de unos binoculares de su propiedad; el recurrido, alegadamente, llevaba a cabo unas transacciones de venta de drogas a plena vista. La utilización de los binoculares permitió que la presencia del agente Soto Ramírez en el lugar no fuese detectada. Además, permitía observar con mayor claridad aquello que a simple vista se podía ver legítimamente. En virtud de ello, tenemos que concluir que en el caso, el utilizar los binoculares no supuso violación a la Constitución.

VI

Por los fundamentos anteriormente expuestos, revocamos la sentencia dictada por el Tribunal de Apelaciones y determinamos que en las circunstancias particulares del caso de autos no hubo un registro y allanamiento irrazonable por lo que no procedía la solicitud de supresión de evidencia. Se devuelve el caso al Tribunal de Primera Instancia para que se continúe con los procedimientos conforme lo aquí dispuesto.

---

[11] Distinto sería el caso si el propósito de utilizar el artefacto tecnológico fuera para observar aquello que no se podría ver sin una intrusión inconstitucional en la intimidad de la persona.

Se dictará sentencia de conformidad.


                         Anabelle Rodríguez Rodríguez
                               Juez Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

El Pueblo de Puerto Rico

    Peticionario

       v.

Jaime Soto Soto                CC-2003-472

    Recurrido

SENTENCIA

San Juan, Puerto Rico, a 22 de mayo de 2006

Por los fundamentos expresados en la Opinión que antecede los cuales se incorporan íntegramente a la presente, se revoca la sentencia dictada por el Tribunal de Apelaciones. Se devuelve el caso al Tribunal de Primera Instancia para que se continúen con los procedimientos conforme lo aquí dispuesto.

Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. "El Juez Asociado señor Rebollo López concurre en el resultado en vista de los hechos específicos y particulares del caso." El Juez Asociado señor Rivera Pérez no intervino.

Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo