**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**April 24, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

ALICIA REEVES; ASHLEE
REEVES,

      Plaintiffs-Appellants,

v.

ALEX CHURCHICH; KEVIN JONES;
DAVID WIERMAN; C. HOUSLEY,

      Defendants-Appellees.

No. 04-4240

---

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 2:02-CV-551-DAK)**

---

Matthew H. Raty, Law Office of Matthew H. Raty, P.C., Salt Lake City, Utah, for
Plaintiffs-Appellants.

Nicolas M. D'Alesandro, Deputy District Attorney for Salt Lake County, Utah
(David E. Yocom, District Attorney for Salt Lake County, and T.J. Tsakalos,
Deputy District Attorney, on the briefs), Salt Lake City, Utah, for Defendant-
Appellee Churchich.

J. Wesley Robinson, Senior City Attorney, Salt Lake City, Utah, for Defendants-
Appellees Jones, Wierman and Housley.

---

Before **MURPHY, SEYMOUR** and **O'BRIEN**, Circuit Judges.

---

**O'BRIEN**, Circuit Judge.

On June 21, 2000, Detective Alex Churchich of the Salt Lake County Sheriff's Office attempted, with the assistance of Officers Kevin Jones, David Wierman and Christie Housley of the Salt Lake City Police Department (The Officers), to apprehend a domestic violence suspect believed to be staying in an upstairs apartment of a duplex. In doing so, they allegedly pointed their weapons at Plaintiffs Alicia and Ashlee Reeves, who resided in the downstairs apartment of the duplex, and prevented them from leaving. The Reeves claim these actions violated their Fourth Amendment right to be free from unreasonable searches and seizures. Detective Churchich and The Officers moved for summary judgment based on qualified immunity. The district court granted their motions, concluding the Reeves had failed to demonstrate a violation of their constitutional rights. The Reeves appeal. We exercise jurisdiction under 28 U.S.C. § 1291 and affirm.

## I. Background

In June 2000, Alicia Reeves and her daughter Ashlee (then fourteen years old) resided in the downstairs apartment of a duplex in Salt Lake City, Utah. Tim and Sharon Bell lived upstairs. The front of the duplex, which contained the duplex's only entry, faced west. The front entrance consisted of a screen door and a regular door, neither of which were capable of being locked. Immediately inside the front entrance was a small landing, with stairs leading up to the Bells' apartment and down to the Reeves' residence.

On the afternoon of June 21, 2000, Detective Alex Churchich of the Salt Lake County Sheriff's Office learned from a witness that Charles Diviney, who was suspected of assaulting his estranged wife, was staying with his sister, Sharon Bell. The witness also told Churchich that Diviney was leaving town and had access to firearms. Based on this information, Churchich decided to attempt to apprehend Diviney at the Bell residence.

Before proceeding to the Bell residence, Detective Churchich contacted the Salt Lake City Police Department for assistance (*i.e.*, an agency assist).[1] The department dispatched Officers Kevin Jones, David Wierman, Cary Wichmann, Ron Bruno, Christie Housley and Alton Hedenstrom. These officers met Churchich in an abandoned lot near the Bell residence.[2] There, Churchich advised them of the situation and informed them that although he did not have a warrant for Diviney, he had probable cause to arrest him for assault. His intent was to perform a "knock and talk" at the Bell residence — approach the Bell residence and seek permission to search it for Diviney. Churchich also warned The Officers that Diviney was possibly armed.

After some discussion, Churchich and The Officers decided Jones, Bruno

---

[1] The Bell residence was located in Salt Lake City which is within Salt Lake County. Although the residence was within the Salt Lake County Sheriff Department's jurisdiction, the department's policy was to contact the city police department which had specific jurisdiction and allow it to assist.

[2] Churchich was wearing a suit; The Officers were in uniform.

-3-

and Housley would attempt entry into the Bell residence while Churchich, Wierman, Wichmann and Hedenstrom performed containment duties outside the duplex.[3]  Thereafter, Churchich and The Officers proceeded to the Bell residence, approaching it from the south.[4]  Once at the residence, Churchich, armed with a rifle and handgun, stationed himself at the southwest corner of the duplex. Wierman, who was also armed with a rifle and handgun, and Wichmann, armed with a handgun, proceeded to the northeast corner of the duplex.  Hedenstrom waited in the lot until the other officers arrived at the Bell residence. He then drove his patrol car to the residence and parked it behind a truck believed to belong to Diviney, to prevent it from leaving.  Hedenstrom then proceeded to the northeast corner of the duplex to perform containment behind Officers Wierman and Wichmann.  The remaining officers, Jones, Bruno and Housley, entered the duplex with their handguns drawn.[5]

The Reeves were in their apartment.  Alicia was on the living room couch starting to take a nap.  Ashlee was taking a shower.  When she finished, Ashlee

---

[3] The purpose of containment is to prevent the suspect from fleeing out the back of the residence.

[4] Although Churchich was aware the Bell residence was the upstairs apartment of a duplex, it is unclear whether The Officers knew this.

[5] Jones, Bruno and Housley carried their handguns either at their sides and pointing to the ground or in the "low ready" position.  The "low ready" position involves the police officer gripping the gun with both hands in front of him while pointing it to the ground.

went into her bedroom to get dressed. Through her opened but barred window,[6] she observed individuals she believed to be police officers walking with guns at their side. She then heard one of the individuals, allegedly Officer Wierman, say "Hold it right there." (R. Vol. II at 470.) She immediately grabbed her towel (she was still naked) and ran into the living room.[7] Ashlee woke Alicia, telling her there were people with guns in the backyard. Alicia, still half asleep and groggy, told Ashlee to go to Alicia's bedroom and get dressed while she determined what was going on.

While in her mother's bedroom, Ashlee observed a rifle barrel, alleged to be Detective Churchich's, through the open but barred window. The barrel was "moving around," following her movement. (R. Vol. II at 469.) Ashlee then heard someone say "Get down on the ground." (*Id.*) In response, Ashlee reached up, closed the blinds and ran out of the room to find her mother.[8]

The dog was barking and would not go out the front door. Alicia decided

---

[6] None of the windows in the Reeves' apartment had screens. However, all of the windows had bars.

[7] According to Wierman, he saw "some movement" through the downstairs apartment window. (R. Vol. II at 336.) When he observed this, he said "Police. Don't move." (*Id.* at 337 (quotations omitted).) Because it was a possible threat, he also pointed his rifle at the window. By the time he made this order, however, the "movement" was already heading west toward the front of the residence, out of Wierman's view.

[8] Churchich denies looking into or pointing his rifle into any ground level window. However, he accepted Ashlee's version of events for purposes of his summary judgment motion.

to take her dog outside. When she reached the duplex's front entrance, she bent forward to pick up her dog. When she stood up, she met Officer Jones, who had just turned around, with his gun pointing at her head.[9] In shock, Alicia pushed the gun away and said "Don't point that gun at me. What's the problem? What's going on?" (R. Vol. I at 207.) She then heard Ashlee scream and ran downstairs to investigate.

Once downstairs, Alicia could see police officers circling her apartment. Scared, she told Ashlee to lie down behind the couch. Ashlee complied and Alicia went back upstairs. She again met Officer Jones and asked him to explain what the officers were doing. After receiving no answers, she went downstairs to her apartment to check on Ashlee.

While there, Alicia heard commotion upstairs. She went outside her door and saw officers pulling Sharon Bell out of the Bell residence.[10] Alicia asked what was going on. Officer Housley told her it was none of her business and to go back inside her apartment. Alicia responded, "It is my business. You are in

---

[9] Jones was not deposed. However, Bruno and Housley testified Jones did not point his weapon at Alicia. Housley stated Alicia was leaving through the front door of the duplex just as she, Jones and Bruno were approaching it. They asked Alicia which residence belonged to the Bells; Alicia pointed to the upstairs apartment. In any event, Churchich and The Officers admitted Jones pointed his weapon at Alicia for purposes of their summary judgment motions.

[10] According to Alicia, The Officers grabbed Sharon Bell by her shirt, threw her down on the ground and held her down. Alicia stated she yelled at The Officers, trying to get them to stop hurting Sharon. Sharon Bell filed a lawsuit against Churchich and The Officers, which was settled.

my apartment. You are in my home. You are . . . invading me. You need to tell me what's going on." (R. Vol. I at 209.) Housley replied, "Get back in your apartment, bitch[.]"[11] (*Id.*) Alicia responded, "I am not leaving. I want to know what's going on." (*Id.* at 211.)

Alicia then began yelling — asking The Officers whether they had a warrant, what was going on and would somebody please talk to her. By that time, Churchich had been called from his containment position to the Bell residence. While standing on the landing inside the duplex's main entrance, Churchich lifted his rifle (which had been pointing at the ground at his side) about three feet and told Alicia to get back in her apartment. Because Alicia was standing below him, when Churchich lifted his rifle, it was pointed at her.[12] She refused to go back inside her apartment and remained outside until Churchich, The Officers and Sharon Bell went inside the Bell residence. At that time, Alicia went to check on Ashlee.

After checking on Ashlee, Alicia again left her apartment. At the landing, she was met by Officer Jones, who asked her questions for his report. After talking with him for a few minutes, she returned to her apartment.

---

[11] Housley denies calling Alicia a "bitch."

[12] Churchich denies pointing his rifle at Alicia. In fact, he testified he does not recall seeing or talking with Alicia on the day of the incident. However, he admitted this allegation for purposes of his summary judgment motion. In an affidavit Sharon Bell said she heard Churchich tell Alicia to go back inside her apartment and saw him point his rifle at her.

Upon learning that Diviney was not at the Bell residence, Churchich and The Officers left the scene. Diviney was later apprehended by the Las Vegas Police Department.

On June 6, 2002, the Reeves filed a civil rights complaint against Churchich, Jones, Wierman, and Housley alleging violations of a Fourth Amendment right to be free from unlawful searches and seizures.[13] The Reeves also claimed Churchich, as The Officers' supervisor, was liable for their allegedly unconstitutional actions.[14] In March and May 2004, Churchich and The Officers filed motions for summary judgment asserting qualified immunity. On September 2, 2004, the district court granted both motions. Judgment was entered five days later. This timely appeal followed.

## II. Discussion

The Reeves claim the district court erred in granting summary judgment on the qualified immunity and supervisor liability claims.

---

[13] The complaint also named police officers Bruno, Wichmann, Hedenstrom and Louie Muniz, as well as Salt Lake County Sheriff's Officer Ray Lopez and Detective Odor. Muniz, Lopez and Odor played little or no role in assisting Detective Churchich in the attempted apprehension of Diviney. The Reeves stipulated to these officers' dismissals without prejudice in March 2003 and May 2004.

[14] The Reeves further asserted pendent state law claims of assault, unlawful detention and intentional infliction of emotional distress. The district court granted judgment in favor of Churchich and The Officers on these claims pursuant to the Utah Governmental Immunity Act. The Reeves do not challenge this ruling on appeal.

A.  Qualified Immunity

We review a grant of summary judgment based on qualified immunity *de novo*, applying the same legal standard used by the district court.  *Lawmaster v. Ward*, 125 F.3d 1341, 1346 (10th Cir. 1997).  Summary judgment should be granted "if the pleadings . . . together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).  In conducting our review, "[w]e view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party."  *Lawmaster*, 125 F.3d at 1346.

"In an action under section 1983, individual defendants are entitled to qualified immunity unless it is demonstrated that their alleged conduct violated clearly established constitutional rights of which a reasonable person in their positions would have known."  *Murrell v. Sch. Dist. No. 1, Denver, Colo.*, 186 F.3d 1238, 1251 (10th Cir. 1999).  Once a defendant has raised qualified immunity as an affirmative defense, the plaintiff bears the heavy two-part burden of demonstrating that (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established at the time of the alleged conduct.  *Reynolds v. Powell*, 370 F.3d 1028, 1030 (10th Cir. 2004).  Our inquiry must be conducted in that order; in other words, we must first address whether the alleged facts demonstrate the defendant's conduct violated a constitutional right.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  If the court concludes no constitutional right

has been violated, no further inquiry is necessary and the defendant is entitled to qualified immunity. *Id.*

1. Violation of Constitutional Right

In this case, the district court found Churchich and The Officers were entitled to qualified immunity because the Reeves had failed to show they violated a constitutional right. Specifically, the court concluded that even assuming a search or seizure occurred under the Fourth Amendment, the conduct was objectively reasonable under the totality of the circumstances.

The Reeves challenge this ruling, arguing they demonstrated Churchich and The Officers violated their Fourth Amendment right to be free from unreasonable searches and seizures. Specifically, they claim they were unlawfully seized when (1) Wierman pointed his rifle at Ashlee and ordered her not to move,[15] (2) Churchich pointed his rifle at Ashlee and ordered her to get down on the ground, (3) Jones pointed his handgun at Alicia's head,[16] and (4) Churchich pointed his rifle at Alicia and told her to return to her apartment. They also assert

---

[15] In neither her deposition nor affidavit did Ashlee testify that Officer Wierman pointed his rifle at her. She simply stated she observed officers with guns at their side in the backyard and heard one of them say "Hold it right there." (R. Vol. II at 470 (quotations omitted).) However, Wierman admitted at his deposition that when he saw "some movement" through Ashlee's bedroom window, he pointed his rifle towards the movement. (*Id.* at 336.)

[16] In their opening brief, the Reeves allege that when Officer Jones pointed his handgun at Alicia's head, he ordered her to "[h]old it right there." (Appellants' Opening Br. at 10.) This command is not supported by the Reeves' record citations; thus, we disregard it.

-10-

Churchich's insertion of his rifle into the interior of Alicia's bedroom constituted an unreasonable search. More generally, the Reeves assert the overall conduct towards them, *i.e.*, weapons repeatedly pointed at them, ordering them not to leave their apartment and the tone and harshness of their commands, conveyed to them they were not free to ignore Churchich and The Officers' presence and go about their business and thus constituted an unlawful seizure of their persons within the meaning of the Fourth Amendment.

We begin with the Reeves' specific arguments.

a.      *Whether Churchich, Jones and Wierman unlawfully seized the Reeves by pointing their weapons at them and making verbal commands.*

The Reeves claim they were unlawfully seized when Wierman pointed his rifle at Ashlee and ordered her not to move, Churchich pointed his rifle at Ashlee and ordered her to the ground, Jones pointed his handgun at Alicia's head and Churchich pointed his rifle at Alicia and told her to return to her apartment. Churchich and The Officers argue no seizure occurred because the Reeves failed to submit to these assertions of authority. We agree.

The Fourth Amendment prohibits unreasonable seizures of an individual's person by law enforcement. U.S. CONST. amend. IV. However, "not all personal intercourse between policemen and citizens involves 'seizures' of persons." *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968). "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a

-11-

citizen may we conclude that a 'seizure' has occurred." *Id.*

In *California v. Hodari D.*, the Court expounded on the "show of authority" requirement for a seizure. 499 U.S. 621 (1991). There, Hodari tossed crack cocaine from his person while engaged in a foot chase with the police. The issue was whether he had been "seized" by the police at the time he discarded the drugs. Because he had not been physically touched by the police at the time he tossed the drugs, Hodari relied on the "show of authority" language from *Terry*. Specifically, he claimed that because the police pursuit qualified as a "show of authority" calling upon him to halt, he was seized. The Court disagreed, holding a police officer's assertion of authority does not constitute a seizure unless the person actually submits. *Id.* at 626. Thus, because Hodari did not stop in response to the police pursuit, no seizure occurred. *Id.* at 629.

We applied *Hodari* in *United States v. Harris*, 313 F.3d 1228 (10th Cir. 2002). There, a police officer approached Harris asking him for his identification. Harris ignored the officer and continued walking. The police officer again asked Harris for identification; he again ignored the request and walked past the officer. Harris then placed his hands in his pockets and began walking backwards facing the police officer. Fearing Harris was concealing a weapon, the police officer asked him to remove his hands from his pockets. When Harris refused, the officer removed them for him and escorted Harris to the police car. On appeal, Harris argued the police officer seized him when the

officer began asking for identification. We disagreed:

> [Harris] ignored [the officer] and continued walking both times that [the officer] requested his identification. Therefore, even if [the officer's] requests for identification could be construed as an "assertion of authority," [Harris] did not submit to it. Accordingly, [Harris] was not seized for purposes of the Fourth Amendment until [the officer] implemented physical force by removing [Harris'] hands from his pockets and escorting him to the police car.

*Id.* at 1235.

Similarly, in *Bella v. Chamberlain*, the plaintiff, while piloting his helicopter, was taken hostage at gunpoint and required to assist in the escape of several inmates from prison. 24 F.3d 1251 (10th Cir. 1994). During law enforcement's attempt to capture the escaped inmates, an officer fired three rounds at the fleeing helicopter, one of which hit the aircraft. Despite his helicopter being hit, the plaintiff continued to flee. The plaintiff brought suit against the police officer, arguing, *inter alia*, that the officer used excessive force in violation of the Fourth Amendment. Relying on *Hodari D.*, we concluded no seizure occurred. Although we found the police officer's firing of his gun constituted an assertion of authority, we concluded no seizure occurred because the shots "did not cause [the plaintiff] to submit nor did they otherwise succeed in stopping him." *Id.* at 1256 (footnote omitted); *see also Latta v. Keryte*, 118 F.3d 693, 700 (10th Cir. 1997) (holding unsuccessful pursuit of the defendant on interstate not a seizure; "[w]hile the pursuit constituted an assertion of authority, the pursuit did not cause Mr. Latta to submit to the authority or succeed in stopping him").

In this case, Churchich, Jones and Wierman did not physically touch either Ashlee or Alicia.[17] However, they clearly asserted their police authority by pointing their weapons and making verbal commands. Nevertheless, in each situation, neither Ashlee nor Alicia submitted to these assertions of authority. When Wierman pointed his rifle at Ashlee and ordered her not to move, she ran out of the room. In response to Churchich pointing his rifle at her and ordering her to get on the ground, Ashlee closed the blinds on the window and ran out of the room. When Jones pointed his handgun at her head, Alicia pushed the gun away. In response to Churchich pointing his rifle at her and ordering her to return to her apartment, Alicia remained standing outside her apartment. Under *Hodari D.* and its progeny, the Reeves' failure to submit to Churchich, Jones and Wierman's assertions of authority precludes a finding that they were seized by these actions. At most, these officers attempted to seize the Reeves, which is insufficient. *Hodari D.*, 499 U.S. at 626 n.2.

The Reeves do not dispute that they did not submit to Churchich, Jones and

_____

[17] When she initially recounted the events of June 21 at her deposition, Alicia testified Officer Jones pointed his gun at her face. Later in her deposition, she stated the gun physically touched her face. In their response to the motions for summary judgment and opening brief, the Reeves do not allege Jones' gun physically touched Alicia. They merely claim Jones "put his handgun to her head" and "pointed it at her head." (R. Vol. I at 166; Appellant's Opening Br. at 9-10.) In any event, even assuming Jones' handgun touched Alicia's face, no seizure occurred because she failed to submit to this assertion of authority. *Bella*, 24 F.3d at 1256 (finding no seizure occurred even though one of the officer's shots hit the helicopter).

-14-

Wierman's assertions of authority. However, they argue they acted reasonably under the circumstances. Because she was naked, the Reeves assert Ashlee reasonably ignored Wierman and Churchich's commands by running from the room. The Reeves also contend Alicia acted reasonably in pushing Jones' gun away from her head. We do not necessarily disagree. However, the reasons behind the Reeves' failure to submit are immaterial to our analysis. For instance, in *Bella*, we recognized the plaintiff was unable to submit to the officer's show of authority because he was being held hostage at gunpoint. 24 F.3d at 1256 n.5. Nonetheless, we concluded this fact did not affect our conclusion that the plaintiff was not seized by the police officer's firing of his weapon at the plaintiff's helicopter. *Id.* Thus, just as we objectively examine a police officer's conduct under the Fourth Amendment, *Brigham City, Utah v. Stuart*, -- U.S. --, 126 S.Ct. 1943, 1948 (2006), the Reeves' subjective motives behind their failure to submit are irrelevant.

Because we conclude Churchich, Jones and Wierman's actions did not result in a seizure of the Reeves' persons, we need not determine whether such seizure was objectively reasonable.

   b.   *Whether Churchich's insertion of his rifle into Alicia's bedroom constituted an unlawful search.*

The Reeves contend the insertion of Churchich's rifle into the interior of Alicia's bedroom window was a search under the Fourth Amendment because the

rifle crossed the "threshold of the home"[18] and Churchich followed Ashlee's movements with it, thereby invading her privacy. (Appellants' Opening Br. at 19.) Churchich argues the momentary insertion of his rifle through Alicia's open but barred bedroom window did not constitute a search under the Fourth Amendment. Even assuming the "threshold of the home" can be applied to a window, he claims the objective of the Fourth Amendment is to protect one's privacy. He alleges his rifle was not a surveillance device and it was not inserted for the purpose of "searching." (Appellee Churchich's Br. at 20.) Therefore, he asserts no private matter was revealed by the insertion of his rifle into Alicia's window.

A search under the Fourth Amendment "occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). Whether an individual has a constitutionally protected reasonable expectation of privacy in an object or place is a two-fold inquiry: (1) whether the individual has manifested a subjective expectation of privacy in the object or place to be searched and (2) whether that expectation is one society is prepared to recognize as reasonable. *United States v. Hatfield*, 333 F.3d 1189, 1195 (10th Cir. 2003). "[T]he burden of establishing a legitimate expectation

_____

[18] Ashlee testified Churchich's rifle came through Alicia's bedroom window, "so it was farther than the [window's] ledge, [which is] inside the room." (R. Vol. II at 470-71.) She later testified the rifle was "even up with the ledge or maybe a little bit over." (*Id.* at 471.) In her affidavit, she stated the rifle "had been put through the foliage and bars on the window" and its barrel "was inside [the] bedroom." (*Id.* at 537.) Thus, we assume the rifle entered the room.

of privacy is on the party claiming a Fourth Amendment violation, and we have applied that same rule to a claimed invasion of the curtilage." *United States v. Cavely*, 318 F.3d 987, 994 (10th Cir. 2003) (citation omitted).

It is well-settled an individual has a reasonable expectation of privacy in the interior of one's home and its curtilage. *Kyllo v. United States*, 533 U.S. 27, 34 (2001); *Oliver v. United States*, 466 U.S. 170, 180 (1984); *see also Hatfield*, 333 F.3d at 1196 ("[P]rivacy in the interior of a home and its curtilage are at the core of what the Fourth Amendment protects . . . ."). However, "[w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *Katz v. United States*, 389 U.S. 347, 351 (1967)*; see also California v. Ciraolo*, 476 U.S. 207, 213 (1986) ("The Fourth Amendment protection of the home has never been extended to require law enforcement officers to shield their eyes when passing by a home on public thoroughfares."). Therefore, no Fourth Amendment search occurs if a police officer makes observations while in a public place or open field, even if the objects he observes lie within an area protected by the Fourth Amendment. *United States v. Dunn*, 480 U.S. 294, 304 (1987). This proposition, however, is not without limitations. If those observations are obtained by a device not in general public use and they reveal information regarding the interior of the home that could not otherwise have been obtained without physical intrusion, such observations are a search under the Fourth Amendment. *Kyllo*, 533 U.S. at 40.

In this case, the Reeves do not argue Churchich unlawfully entered the duplex's front yard, and rightly so. Although the Reeves have a constitutionally protected reasonable expectation of privacy in the interior of their apartment, they have no such expectation in the duplex's front yard where Churchich was standing when he allegedly pointed his rifle through Alicia's bedroom window. There is no evidence the front yard is enclosed or otherwise shielded to prevent passersby from viewing the activities conducted there. There is also no evidence the Reeves could exclude others from the yard and it appears they shared the yard with the Bells.

The yard is also not part of the duplex's curtilage. "[C]urtilage is the area to which extends the intimate activity associated with the sanctity of a man's home and the privacies of life." *Oliver*, 466 U.S. at 180 (quotations omitted). It is entitled to the same Fourth Amendment protections that attach to the home itself. *Id.* We consider four factors in determining whether an area around a house is considered curtilage: (1) the proximity of the area to the home; (2) whether the area is included within an enclosure surrounding the home; (3) the nature of the uses to which the area is put, specifically, whether the area is used for the intimate activities of the home; and (4) the steps taken by the resident to protect the area from observation. *Dunn*, 480 U.S. at 301; *United States v. Cousins*, 455 F.3d 1116, 1122-23 (10th Cir. 2006). Applying these factors, although the front yard is in close proximity to the duplex, there is no evidence it (or any part thereof) is enclosed, is used for intimate

-18-

activities of the home or is in any way protected from observation.[19]  Thus, we conclude the front yard is not within the duplex's curtilage but rather is an "open field."  *Dunn*, 480 U.S. at 304 ("[T]he term 'open fields' may include any unoccupied or undeveloped area outside of the curtilage.  An open field need be neither 'open' nor a 'field' as those terms are used in common speech.") (quotations omitted)).  Therefore, Churchich's entry into the yard did not violate the Fourth Amendment.  *Oliver*, 466 U.S. at 181 ("[A]n individual has no legitimate expectation that open fields will remain free from warrantless intrusion by government officers."); *Cousins*, 455 F.3d at 1124 (concluding that because the defendants' sideyard did not fall within the curtilage of their home, law enforcement presence in the sideyard did not violate the Fourth Amendment).  Consequently, Churchich's mere visual observation of objects or people inside the Reeves' apartment through Alicia's bedroom window from the front yard was not a search under the Fourth Amendment.[20]  *See Dunn,* 480 U.S. at 303-05 (finding police

---

[19] The Reeves' argument expects us to presume their front yard was curtilage.  They assume too much.  There were no proofs regarding the *Dunn* curtilage factors and nothing in the record suggests the Reeves had a reasonable expectation of privacy in the front yard of a jointly occupied apartment.  *See Cavely*, 318 F.3d at 994 ("The record before us contains no evidence on these matters [*Dunn* factors], and appellant did not ask the district court to make any findings with respect thereto.").  Absent contrary facts and findings, the correct presumption would be that an unenclosed yard, used for no particular purpose (but shared with other tenants), adjacent to the street, and in no way shielded from observation or trespass is not curtilage.

[20] The fact Alicia's window contained bars covered in foliage does not detract from this conclusion.  "[T]he mere fact that an individual has taken

officer's visual observation of barn's interior by peering into its open front with a flashlight while standing outside the curtilage and in the open fields did not constitute a search); *Hatfield*, 333 F.3d at 1194 (finding officer's visual observation of the defendant's backyard from an open field (the defendant's pasture) did not constitute a search).

However, Churchich's conduct in this case was not limited merely to observation with the naked eye. Rather, he inserted his rifle past the window's ledge and followed Ashlee's movements with it. The Reeves allege this intrusion constituted a search under the Fourth Amendment. The question presented in this case is whether a police officer, while standing in an open field, conducts a search by inserting his rifle into the interior of a home and using it to follow the movement of a person therein.

Not surprisingly, we have unearthed no cases directly on point. That is because when a police officer uses his weapon, it is normally to threaten or inflict deadly force. Under those circumstances, the inquiry is whether such use constitutes a seizure, not a search, under the Fourth Amendment. As discussed above, Churchich's pointing of his rifle at Ashlee through Alicia's bedroom window

---

measures to restrict some views of his activities [does not] preclude an officer's observations from a public vantage point where he has a right to be and which renders the activities clearly visible." *Ciraolo*, 476 U.S. at 213. Additionally, Alicia's bedroom window was open. There is no allegation that Churchich moved the window's blinds, either with his rifle or hand, to obtain a better view of the home's interior.

did not constitute a seizure because she failed to submit to this show of authority. We have also uncovered limited case law addressing whether a police officer conducts a search merely by sticking an object he is holding into a home's interior. In most cases, the police officer's person, or parts of his person, enter the home. Thus, we are left to analogize this case to existing precedent. Having done so, we conclude Churchich's insertion of his rifle into the interior of the Reeves' home and following Ashlee's movement with it was not a search because the rifle was incapable of obtaining information and did not obtain any information beyond that which was observed by Churchich standing in the common area. Nor did the insertion of the rifle through the window enable Churchich to see that which would not otherwise be visible.

In *Silverman v. United States*, police officers used a "spike mike" to eavesdrop on the defendants' conversations. 365 U.S. 505 (1961). The officers inserted the spike under a baseboard of an adjoining house until the spike hit a heating duct serving the defendants' house. The Court found such intrusion into the home, even if it was only by a "fraction of an inch," was a search under the Fourth Amendment. *Id.* at 511-12.

In *United States v. Knotts*, police officers learned Tristan Armstrong was purchasing chemicals used in the manufacture of illegal drugs from the Hawkins Chemical Company (Hawkins). 460 U.S. 276 (1983). With Hawkins' permission, the officers installed a beeper inside a five-gallon container of chloroform, one of

-21-

the chemicals being purchased. Hawkins agreed that when Armstrong next purchased chloroform, this container would be given to him. When Armstrong made the purchase, the officers followed his vehicle, maintaining contact with the car using both visual surveillance and the beeper. Armstrong proceeded to co-defendant Darryl Petschen's house, where the container was transferred to Petschen's vehicle. The officers then followed that vehicle, until it began making evasive maneuvers, at which time the officers ended their visual surveillance. Almost simultaneously, the officers lost the beeper's signal. An hour later, the officers recovered the signal. Its location was identified as Leroy Knotts' cabin. Over the next three days, the officers performed visual surveillance of the cabin. They eventually secured a search warrant, its execution uncovering a clandestine drug laboratory. Knotts was arrested and convicted for conspiring to manufacture controlled substances.

Knotts argued the officers' monitoring of the beeper without a warrant violated the Fourth Amendment. The Supreme Court disagreed. It concluded the monitoring had not invaded Knotts' legitimate expectations of privacy and thus was not a search under the Fourth Amendment. *Id.* at 285. It explained:

> Admittedly, because of the failure of the [officers'] visual surveillance, the beeper enabled the [officers] to ascertain the ultimate resting place of the chloroform when they would not have been able to do so had they relied solely on their naked eyes. But scientific enhancement of this sort raises no constitutional issues which visual surveillance would not also raise. A police car following Petschen at a distance throughout his journey could have observed him leaving the public highway and arriving

-22-

at [Knotts' cabin], with the drum of chloroform still in the car. This fact, along with others, was used by the government in obtaining a search warrant which led to the discovery of the clandestine drug laboratory. *But there is no indication that the beeper was used in any way to reveal information as to the movement of the drum within the cabin, or in any way that would not have been visible to the naked eye from outside the cabin.*

*Id.* at 285 (emphasis added).

The Supreme Court distinguished *Knotts* in *United States v. Karo*, 468 U.S. 705 (1984). There, an agent with the Drug Enforcement Administration learned James Karo, Richard Horton and William Harley had ordered fifty gallons of ether from a government informant. The ether was to be used to extract cocaine from clothing that had been imported into the United States. The agent obtained a court order authorizing the installation and monitoring of a beeper in one of the cans of ether. Thereafter, the agent observed Karo pick up the ether from the informant. The agent followed Karo to his house using both visual and beeper surveillance. Over the course of the next several months, the agent tracked the ether's movement from various locations to a rental house in Taos, New Mexico. Once the ether arrived at the rental house, the agent used the beeper to determine the ether remained in the home despite vehicles leaving the residence. When the agent noticed the windows of the house were wide open on a cold, windy day, he suspected the ether was being used. The next day, the agent applied for and received a search warrant for the Taos residence based in part on information derived from the use of the beeper. The search revealed cocaine and laboratory

equipment.

The defendants challenged the agent's installation and monitoring of the beeper under the Fourth Amendment. The Supreme Court concluded the mere transfer of the can containing a beeper to Karo was not a search under the Fourth Amendment because at that time the beeper was not conveying any information. *Id.* at 712. However, the Court held the monitoring of the beeper while it was located within the Taos residence constituted a search under the Fourth Amendment. *Id.* at 714-15. In doing so, it distinguished *Knotts*, where the beeper told the officers nothing about the interior of Knotts' cabin and all of the information obtained could have been obtained through visual surveillance. *Id.* at 715.

Lastly, in *United States v. Concepcion*, police officers arrested Concepcion, seizing his possessions, including his keys. 942 F.2d 1170 (7th Cir. 1991). The officers found a mailbox with his last name at a nearby apartment complex. One of Concepcion's keys opened the outer door of the apartment building. Once inside the building, the officers used the key to open apartment 1C. They opened the door an inch, then immediately closed and locked it without looking inside. Concepcion argued, *inter alia*, that the entry of the key into his apartment door's lock constituted a search. The Seventh Circuit agreed:

> A keyhole contains *information*—information about who has access to the space beyond. As the fourth amendment protects private information rather than formal definitions of property, the lock is a potentially protected zone. And as the tumbler of a lock is not accessible to strangers, . . . the use of an instrument to examine its workings (that is, a

-24-

key) looks a lot like a search. . . . Because the agents obtain information from the inside of the lock, which is both used frequently by the owner and not open to public view, it seems irresistible that inserting and turning the key is a search.

*Id.* at 1172 (citations and quotations omitted).[21]

In both *Silverman* and *Concepcion* the courts found the police officers' insertion of an object into the home, or at least its lock, constituted a search. However, in both cases, that insertion conveyed information. In *Silverman*, the insertion of the spike allowed the officers to listen to conversations they would otherwise not have been able to hear. In *Concepcion*, the officers' insertion of the key informed the officers that the apartment belonged to the defendant. Here, no information was obtained by insertion of the rifle into the Reeves' home.

In *Knotts* and *Karo*, the police officers themselves did not enter the home. However, like this case, they caused an object to do so. Nevertheless, the mere fact the object entered the home did not automatically transform the officers' actions into a search. Rather, only when the object revealed information that could not have been obtained by visual observation alone did a search occur. Indeed, in *Karo*, the Court found: "The mere transfer to Karo of a can containing an unmonitored beeper infringed no privacy interest. It conveyed no information that Karo wished to keep private, *for it conveyed no information at all*." 468 U.S. at 712 (emphasis added).

---

[21] *But see United States v. Lyons*, 898 F.2d 210, 212 (1st Cir. 1990) (insertion of key seized from the defendant into padlock of storage unit for purposes of identifying ownership not a search).

The same is true here. The insertion of the rifle into the open window revealed no information Churchich could not have obtained by visual observation alone. Indeed, it neither conveyed information nor facilitated Churchich's ability to attain information from within the apartment. At most then, the insertion of the rifle constituted a common law trespass, not a Fourth Amendment violation.

Of course, a police officer's mere entry or trespass into a home without consent is enough to constitute a search, often referred to in the case law as an "unlawful entry." *See, e.g., Brigham City*, 126 S.Ct. at 1947-48 (2006) (finding police officers' warrantless entry into home without consent is a search but a reasonable one under exigent circumstances exception to warrant requirement); *United States v. Najar*, 451 F.3d 710, 720 (10th Cir.) (same), *cert. denied*, 127 S.Ct. 542 (2006); *United States v. Carter*, 360 F.3d 1235, 1241-42 (10th Cir. 2004) (concluding police officer's warrantless entry into backyard and garage was an unreasonable search because it was not supported by exigent circumstances or justified as a protective sweep); *see also* 2 WAYNE R. LaFAVE ET AL., CRIMINAL PROCEDURE § 3.2(c) (2d ed. 1999) ("Because the home is accorded the full range of Fourth Amendment protections, it is beyond question that an unconsented police entry into a residential unit, be it a house, apartment, or hotel or motel room, constitutes a search under *Katz*.") (quotations and footnote omitted). However, a police officer possesses sensory capabilities, *i.e.*, the ability to obtain information. Indeed, in each of the cited cases, the police officers entered the home to seek

information that could not have been obtained absent an intrusion. *Brigham City*, 126 S.Ct. at 1946 (entry to investigate observed altercation); *Najar,* 451 F.3d at 719 (entry to determine whether 911 caller was inside home); *Carter*, 360 F.3d at 1238 (entry into backyard and garage to secure it and prevent destruction of evidence). A rifle, on the other hand, does not possess sensory capabilities and its insertion in this case was not for purposes of obtaining information.

Because Churchich's insertion of his rifle inside Alicia's bedroom was not a search, we need not determine whether it was objectively reasonable. We now turn to the Reeves' argument that they were unlawfully seized by Churchich and The Officers' overall conduct at the scene.

c. *Whether Churchich and The Officers' overall conduct towards the Reeves at the scene constituted an unlawful seizure.*

The Reeves contend the overall conduct towards them at the scene conveyed to them they were not free to ignore Churchich and The Officers' presence and go about their business and thus constituted a seizure of their persons within the meaning of the Fourth Amendment.[22] Churchich and The Officers argue their actions did not seize the Reeves. They claim it is undisputed that neither Alicia nor

---

[22] Although we have concluded the Reeves were not seized when Churchich, Jones and Wierman pointed their weapons and made verbal commands toward them, the Reeves could have potentially been unlawfully seized at other times during the encounter. Therefore, in resolving the Reeves' argument that they were illegally seized by Churchich and The Officers' overall conduct at the scene, we look to the entire encounter, not merely the specific instances addressed earlier.

Ashlee was physically restrained, informed they were being detained or told they were not free to leave. Indeed, Churchich and The Officers allege the Reeves never asked whether they were free to go or stated they wished to leave the apartment. They point out Ashlee never attempted to leave the apartment and never spoke with any of them. In fact, they allege it was Alicia who told her to stay in the apartment. Churchich and The Officers also emphasize Alicia left her apartment at least four times during the incident.

A person has been "seized" within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the encounter, a reasonable person would have believed he was not free to leave, decline the officers' requests or otherwise terminate the encounter. *Florida v. Bostick,* 501 U.S. 429, 439 (1991); *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)*; see also Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968) ("[N]ot all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred."). In *Mendenhall*, the Court provided "[e]xamples of circumstances that might indicate a seizure, even where the person did not attempt to leave . . . ." 538 U.S. at 554. Such circumstances included "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Id*.

To these circumstances we have added the "prolonged retention of a person's personal effects," "a request to accompany the officer to the station," "interaction in a nonpublic place or a small, enclosed place" and the "absence of other members of the public." *Jones v. Hunt*, 410 F.3d 1221, 1226 (10th Cir. 2005) (quotations omitted). "None of these factors are dispositive, nor should they be treated as exclusive . . . ." *Fuerschbach v. Sw. Airlines Co.*, 439 F.3d 1197, 1203 (10th Cir. 2006).

The Reeves' actions, in particular Alicia's, clearly contradict their argument for seizure within the meaning of the Fourth Amendment. As to Ashlee, it is undisputed she never left or attempted to leave the apartment during the incident. Nevertheless, Churchich and The Officers' pointing of their rifles would have conveyed to a reasonable person in Ashlee's position, especially considering her age, that she was not free to leave. *Jones*, 410 F.3d at 1226 (stating we must look at whether a reasonable person of plaintiff's age would have felt free to leave). With regards to Alicia, her conduct at the scene belies her contention that she believed she was not free to leave the apartment. By her own account, she left the apartment four times to determine the purpose of the police activity. She did so despite Churchich and The Officers' allegedly harsh verbal commands to return to her apartment and their display and pointing of weapons.[23]

[23] The Reeves' argument that they were seized because Churchich and The Officers' actions prevented them from going about their business of getting dressed and taking a nap is equally unavailing. They rely on *Kaupp v. Texas*,

To the extent a seizure occurred, such seizure was objectively reasonable. The Fourth Amendment only prohibits unreasonable searches and seizures. *Pennsylvania v. Mimms*, 434 U.S. 106, 108-09 (1977) ("The touchstone of our analysis under the Fourth Amendment is always the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.") (quotations omitted). "In judging [the] reasonableness [of a seizure], courts apply a balancing test that looks to the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." *Walker v. City of Orem*, 451 F.3d 1139, 1148 (10th Cir. 2006) (quotations omitted). Considering the totality of the circumstances, we conclude any seizure of the Reeves which occurred during the attempted apprehension of Diviney was reasonable.

Churchich and The Officers were attempting to apprehend a potentially armed suspect, whom they had probable cause to arrest for assault. Therefore, it was reasonable for them to have their weapons displayed and ready for immediate use.

which in turn relied on *Bostick* and *Michigan v. Chesternut*, 486 U.S. 567 (1988), for the proposition that a seizure of a person "occurs when, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *Kaupp v. Texas*, 538 U.S. 626, 629 (2003) (quotations omitted). The fact the Reeves may not have been able to continue with the specific activities they were engaged in prior to Churchich and The Officers' presence is irrelevant. The key is that they were free to continue in activities not mandated by Churchich and The Officers. In fact, Alicia's subsequent activities were directly contrary to Churchich and The Officers' requests that she return to her apartment.

*Holland v. Harrington*, 268 F.3d 1179, 1192 (10th Cir. 2001) ("The display of weapons . . . should be predicated on at least a perceived risk of injury or danger to the officers or others, based upon what the officers know at that time."); *Thompson v. City of Lawrence, Kan.*, 58 F.3d 1511, 1516 (10th Cir. 1995) (not unreasonable for officers to carry weapons when entering the premises of a suspected felon with a reputation for possessing firearms). They also reasonably pointed their weapons at the Reeves. While neither Alicia nor Ashlee was the male suspect Churchich and The Officers were looking for, they did not know the nature of their relationship, if any, to Diviney. *Thompson*, 58 F.3d at 1517 (handcuffing and detention of plaintiff at arrest scene reasonable where police did not know the nature of her relationship to arrestee). It is also undisputed that Churchich and The Officers' pointing of their weapons at the Reeves was brief and limited in duration to determining the Reeves' threat level. Once the perceived threat was extinguished, Churchich and The Officers did not continue to point their weapons at them. *Cf. Holland*, 268 F.3d at 1193 ("Where a person has submitted to the officers' show of force without resistance, and where an officer has no reasonable cause to believe that person poses a danger to the officer or to others, it may be excessive and unreasonable *to continue* to aim a loaded firearm directly at that person, in contrast to simply holding the weapon in a fashion ready for immediate use.") (emphasis added).

It was also reasonable for Churchich and The Officers to order the Reeves to return to their apartment. They were faced with a potentially volatile situation and

the Reeves' safety may have been at risk. Additionally, Alicia repeatedly interfered with the task at hand. It was reasonable for Churchich and The Officers to direct her to return to her apartment. Moreover, based on Alicia's refusal to comply with Churchich and The Officers' demands to return to her apartment, it was reasonable to increase the harshness and tone of their commands. Indeed, "this case presents the classic situation in which a plaintiff's own actions in reaction to a legitimate law enforcement encounter result in escalating volatility and danger justifying the subsequent actions of the law enforcement officers involved." *Latta*, 118 F.3d at 698; *see also Michigan v. Summers*, 452 U.S. 692, 702-03 (1981) (concluding detention of occupant of place to be searched during execution of search warrant was reasonable; "[t]he risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation").

Of course, we do not condone Officer Housley calling Alicia a "bitch." As we recognized in *Holland*, "expletives communicate very little of substance beyond the officer's own personal animosity, hostility or belligerence" and "[o]ne can be firm and direct without being foul and abusive." 268 F.3d at 1194. Nevertheless, the use of such single expletive at someone who was not heeding an officer's orders does not render the officer's otherwise lawful conduct unreasonable.

2. Clearly Established

Because Churchich and The Officers' conduct at the scene, both their specific

-32-

actions and overall conduct, did not violate the Reeves' constitutional rights, no further inquiry is necessary. The district court correctly concluded they were entitled to qualified immunity.

B. Supervisor Liability

The Reeves contend the district court erred in dismissing their supervisory liability claim against Churchich. They allege Churchich's failure to properly supervise and inform The Officers was the cause in fact of The Officers' violations of their constitutional rights and Churchich should be held responsible for these violations. Even assuming Churchich was The Officers' supervisor,[24] because The Officers did not violate the Reeves' constitutional rights, no supervisory liability attaches to Churchich. *See Serna v. Colo. Dep't of Corr.*, 455 F.3d 1146, 1151 (10th Cir. 2006) ("In order to establish a § 1983 claim against a supervisor for the unconstitutional acts of his subordinates, a plaintiff must first show the supervisor's subordinates violated the constitution.").

AFFIRMED.

---

[24] There was conflicting testimony on this point. Churchich testified The Officers were in charge of how Diviney would be apprehended. Officer Bruno agreed. Officer Wierman testified Churchich was "definitely" involved "to some degree" in deciding how The Officers were to proceed in apprehending Diviney but stated his specific conduct at the scene was at his own discretion. (R. Vol. II at 318.) Officer Munoz testified the primary responsibility in an agency assist rests with the agency requesting the assistance. Officer Housley stated Churchich was "in charge" of The Officers but they would have only followed his suggestions if they were reasonable. (*Id.* at 394.) Officer Wierman, on the other hand, considered Officer Jones to be in charge of The Officers.